CITY OF TRAVERSE CITY *v.* TOWNSHIP OF BLAIR.

1. Municipal Corporations—Cities—Electricity—Power—Taxation—Public Utility.

An electric light and power plant owned and operated by the city of Traverse City for the use and benefit of the public is exempt from taxation under section 3830, 1 Comp. Laws, as amended by Act No. 174, Pub. Acts 1911 (1 Comp. Laws 1915, § 4001).

2. Same—Townships—Right to Tax Municipal Utilities—Exempt Realty.

The plant, being located in defendant township beyond the boundaries of Traverse City, was not assessable for the alleged reason that exempting the property would unequally affect the amount of property subject to taxation in the township for the benefit of the other municipality. And the court has no power to correct any injustice that may result to the township because of the exemption, the determination

of the legislature being conclusive on the courts in such matters.

3. SAME—HOME RULE ACT—CONSTITUTIONS—TOWNSHIPS.
    Under the "home rule act" (1 Comp. Laws 1915, § 3304 *et seq.*) construing the relative words to refer to the nearest antecedent pursuant to the usual rule, only transportation properties are excluded from the exempt class: it being a rule of statutory construction that the last antecedent is the last which can be made an antecedent without impairing the meaning of the sentence.

4. SAME—TAXATION.
    Although the power plant occupied but 15 acres of 60 contained in the tract, leaving about 45 acres along the river which was not developed, the necessity of securing a reasonable amount of land as part of the plant to obviate injury to riparian owners and protect plaintiff's power rights, properly brings the entire acreage within the statutory exemption.

Error to Grand Traverse; Mayne, J. Submitted October 22, 1915. (Docket No. 88.) Decided March 30, 1916.

Assumpsit by the city of Traverse City against the township of Blair for the recovery of taxes paid under protest. Judgment for defendant. Plaintiff brings error. Reversed.

*Covell & Cross* (*Dallas Boudeman*, of counsel), for appellant.

*Parm C. Gilbert*, for appellee.

STEERE, J. Plaintiff, an incorporated city, brought this action to recover the amount of taxes, paid by it under protest, which had been assessed for the year 1913 against its electric light and power plant located within the territorial confines of defendant township.

Plaintiff's protest and right to recover are based upon subdivision 3 of section 3830, 1 Comp. Laws, amended in 1911, Act No. 174, Pub. Acts 1911 (1

Comp. Laws 1915, § 4001), which exempts from taxation "lands owned by any county, township, city, village, or school district and buildings thereon used for public purposes."

The case was tried before the court without a jury on December 22, 1914. "Findings of the court" were filed upon that and the succeeding day, in each of which it is stated that the material facts are not in dispute, and both findings are devoted entirely to a discussion of the legal questions involved. On December 24, 1914, defendant's counsel filed proposed amendments of fact and law to the findings of the court, which were followed on January 2, 1915, by "amended findings of fact and law" devoted only, however, to a further discussion of the law, the facts apparently being taken for granted. On February 12, 1915, the proposed amendments previously filed by plaintiff's counsel to the court's finding were considered and passed upon by the court, some being refused, others granted, and still others modified. From these findings and the apparently undisputed testimony, in relation to which the court twice found the facts were not in dispute, the following summary of the case is sufficient for an understanding of the questions of law involved:

Traverse City purchased the electric plant in question in 1912 for $150,000 from the Queen City Electric Light & Power Company, a private corporation, which had then developed and was operating the plant. This company owned 60 acres of land lying along the Boardman river in defendant township, where it had constructed a dam, storage pond, and power plant, which it used for the purpose of generating electricity, furnishing light and power to the city of Traverse City and its inhabitants for domestic and manufacturing purposes. Plaintiff purchased it as a going concern and took over the entire property, together with all contracts which the Queen City Company had.

The purchase included all property owned by the selling company, both real and personal. The dam and power plant are located about 6 miles from Traverse City, current being conveyed to the city by a transmission line of which about 100 rods extend through the defendant township and the balance through other territory. Shortly after the purchase of the plant in 1912 plaintiff took possession and assumed control of all the property so purchased, both inside and outside of its own municipal boundaries, and proceeded to operate it as a municipally owned plant, doing its own public lighting and also supplying its inhabitants, selling electric current for light and power to all parties desiring to use the same. It appears from the evidence as to earnings and amount of current disposed of that about 70 per cent. of the income of this plant is derived from what is termed commercial business, or sales to private users, and the remaining 30 per cent. in meeting demands of the municipality itself. From the fact that a large proportion of the electric current furnished by this plant is sold to private consumers, the court concluded as a matter of law that the property in question was not used for public purposes, saying:

"The uses shown to have been made of the property in question in this case is not a public use within the meaning of the tax law exempting certain property from taxation."

The authority of plaintiff to acquire this plant and operate it as a municipal public utility for the purpose and in the manner shown is not open to question. Its own charter (Act No. 424, Local Acts 1895) expressly authorized the city of Traverse City to construct or acquire by purchase electric lighting and power works, operate, maintain, and extend the same for the purpose of supplying the city and inhabitants thereof with electric light and power, and for any other purpose

on such terms and conditions as its council may direct, while sections 22 and 23, article 8, of our Constitution affirm and amplify this authority as follows:

"SEC. 22. Any city or village may acquire, own, establish and maintain, either within or without its corporate limits, parks, boulevards, cemeteries, hospitals, almshouses and all works which involve the public health or safety.

"SEC. 23. Subject to the provisions of this Constitution, any city or village may acquire, own and operate, either within or without its corporate limits, public utilities for supplying water, light, heat, power and transportation to the municipality and the inhabitants thereof; and may also sell and deliver water, heat, power and light without its corporate limits to an amount not to exceed twenty-five per cent. of that furnished by it within the corporate limits."

The scope of a city's power under these provisions and the manner in which such a public utility may be operated has been recently discussed in *Andrews* v. *City of South Haven,* 187 Mich. 294 (153 N. W. 827, L. R. A. 1916A, 908). The right of a city to own a power plant outside its territorial confines and, after supplying its direct municipal needs, sell light or power both to its inhabitants and, within specified proportions, to customers without its corporate limits is no longer an open question of implied authority, but in plain words is brought within the limit of express power granted by the Constitution.

While in distinguishing the purely governmental powers of a municipality from its authorized business activities in supplying itself and its inhabitants with a certain class of utilities and conveniences for which in places of concentrated population there is a general need, and which it is recognized under present conditions of civilization public welfare demands, the latter are sometimes referred to as private business enterprises, perhaps because such wants may be and some-

times are supplied for profit by private parties; yet in the final analysis they are in no true sense private business or private property when operated and owned for public benefit by a municipality under constitutional or statutory authority. No question of private gain or private support is involved. The benefits, whether in direct profits or in protection of health, property, or life, accrue to and all losses fall upon the public generally. The only underlying support for all such public business activities is taxation, and taxation can only be for public purposes. Possible confusion of terms is cleared up and the real difference pointed out in the recent case of *Wood* v. *City of Detroit*, 188 Mich. 547 (155 N. W. 592), as follows:

"The distinction between powers governmental in character and those private in character, as exercised by municipal corporations, does not involve the abrogation of the distinction between private municipal activity and private individual activity. To employ a seeming paradox, private municipal activities are all of them public. What has been called private in municipal activity is, nevertheless, public when contrasted with purely private enterprise and adventure. * * ~ * There is not, and there cannot be, any merely local power to tax persons or property, and municipal activity may still be, and it is the command of the Constitution that it shall be, restricted, limited, by the limitation of the power to tax, to borrow money and to exploit the municipal credit."

That after supplying its own direct, municipal needs the city furnished light or power to private parties and received a revenue therefrom, in no way detracts from the municipal or public purpose for which such authorized public utility was owned and operated. Neither is it of importance whether the enterprise was in itself profitable or unprofitable; it remained public property, owned and operated as an authorized public utility for municipal purposes and the general welfare, dependent for its credit and existence upon public sup-

port by taxation to whatever extent its necessities required.

That this plant, owned and operated by the city to supply itself and its inhabitants with light and power, is used for public purposes not only finds support in text-books and decided cases from other jurisdictions, but is, we think, settled law under decisions of this court rendered prior to the more recent and radical constitutional provisions and legislation adopted in this State authorizing municipal ownership of public utilities.

In the early case of *People* v. *Salem*, 20 Mich. 452 (4 Am. Rep. 400), in which it was held by a divided court that to pledge the credit of a municipal corporation in aid of a contemplated railroad to be constructed by a private corporation was an incipient step in the exercise of the power of taxation, and, not being for a public purpose, legislation authorizing the same could not be sustained, it is stated as a general proposition in the majority opinion written by Justice COOLEY that:

"Where the State itself is to receive the benefit of the taxation, in the increase of its public funds or the improvement of its public property, there can be no doubt of the public character of the purpose."

Touching the purpose of a municipal use or ownership the court said:

"We perceive, therefore, that the term 'public purposes,' as employed to denote the basis for which taxes may be levied, has no relation to the urgency of the public need, or to the extent of the public benefit which is to follow. It is, on the other hand, merely a *term of classification, to distinguish the object for which, according to settled usage, the government is to provide, from those which, by the like usage, are left to private inclination, interest, or liberality.*"

In harmony with modern development along those lines, legislation and constitutional provision have

strengthened and defined the authority of cities to provide public utilities like the one in question and recognized them as within the scope of public affairs distinct from pure municipal trading, and the burden of such municipal activities for public good has been assumed and borne by municipalities until it can well be said to have become a settled usage.

In *Mitchell* v. *City of Negaunee,* 113 Mich. 359 (71 N. W. 646, 38 L. R. A. 157, 67 Am. St. Rep. 468), proceedings were brought by taxpayers to restrain the expenditure of public money in developing a public municipal lighting plant, it being contended that it was a private business enterprise in which electric current was to be furnished to private purchasers for profit, in competition with private capital, whereas taxes could only be imposed for a public and not a private purpose. This court there rejected such contention and held that it was within the province of the legislature to confer upon municipalities, under proper restrictions, the right to install plants for municipal lighting and to furnish light to their citizens, sustaining the tax, which could only be for a public purpose, and adopting the views of the Massachusetts court in *Opinion of Justices,* 150 Mass. 592 (24 N. E. 1084, 8 L. R. A. 487). In the latter case it is said, among other things:

"We have no doubt that, if the furnishing of gas and electricity for illuminating purposes is a public service, the performance of this service can be delegated by the legislature to cities and towns for the benefit of themselves and their inhabitants, and that such cities and towns can be authorized to impose taxes for this purpose upon their inhabitants, and to establish reasonable rates which the inhabitants who use the gas or electricity can be compelled to pay."

As to the constitutionality of such legislation the court said:

"If the legislature is of opinion that the common convenience and welfare of the inhabitants of cities or towns will be promoted by conferring upon the municipalities the power of manufacturing and distributing gas or electricity for the purpose of furnishing light to their inhabitants, we think that the legislature can confer the power."

It is particularly urged by defendant that the exemption in question does not and was not intended to apply to property owned by a municipality located outside of its territorial limits which, without any compensating benefits, would unfairly lessen the taxable property of one municipality for the benefit of another. We are impressed that the earnest argument made against the unfairness and injustice of such a law is more properly for consideration of the legislature than of the court. The right of the legislature either to tax or exempt such public property is not open to question. Whatever views may be entertained upon this contention, "the judiciary has no general authority to correct the injustice of legislative action in matters of taxation, and the weight of authority clearly is that, as regards these cases, the determination of the legislature is conclusive." Cooley on Taxation (3d Ed.), p. 247.

The exempting language of the general statutory provision is plain, without distinction as to location, and we find no rule of construction ·authorizing the court to read into the act any exceptions based on territorial boundaries. As it reads it clearly applies to such public property used for public purposes wheresoever located. In the absence of some plain and direct exception, other courts, when called upon to consider the question, have as a rule denied their authority to restrict the legislation by adding such a test. In the following cases exemptions of like import· with the one under consideration have been construed as

unaffected by territorial limitations, and it is held that property of one municipality located within the boundaries of another is included within the exemption: *Town of West Hartford* v. *Water Commissioners,* 44 Conn. 360; *City of Somerville* v. *City of Waltham,* 170 Mass. 160 (48 N. E. 1092) ; *Reading* v. *Berks County,* 22 Pa. Super. Ct. 373; *State* v. *Township of Verona,* 59 N. J. Law, 94 (34 Atl. 1060) ; *Wayland* v. *Middlesex County,* 4 Gray (70 Mass.), 500; *People, ex rel. Mayor, etc., of City of New York* v. *Board of Assessors,* 111 N. Y. 502 (19 N. E. 90, 2 L. R. A. 148) ; *State* v. *Conover,* 63 N. J. Law, 191 (42 Atl. 838) ; *City of Rochester* v. *Town of Rush,* 80 N. Y. 302; *City of Perth Amboy* v. *Barker,* 74 N. J. Law, 127 (65 Atl. 201) ; *City of Toledo* v. *Hosler,* 54 Ohio St. 418 (43 N. E. 583) ; *In re Town of Orillia,* 7 Ont. Law Rep. 389.

To review these cases and the many others which may be found dealing with this subject in all its aspects would be a work of supererogation, but it can be stated without fear of successful contradiction that the best reasoned and great weight of authority fully sustains plaintiff's contentions on the general propositions here involved.

It is further contended, however, that subdivision (*i*) of section 4 of the so-called "Home Rule Act" has modified the scope of the general provision in the tax law which exempts realty of municipalities devoted to public purposes, and discloses a legislative intent to except from the general exemption public utility property of municipalities when located outside their corporate boundaries. The home rule act, first enacted in 1909, has been amended at each regular succeeding session of the legislature. Up to 1913 a city was only authorized by it to own and operate transportation facilities within its limits, and then only if its population had reached 25,000 inhabitants according to the next preceding United States census. As to this par-

ticular municipal activity the legislature, in distinction from other kinds of municipal property in public use, saw fit from the beginning to provide that upon it a city must pay State and county taxes, in that particular ranking street car lines, or property used exclusively for transportation, as in a different class and less entitled to consideration as distinctly of public concern and need than cemeteries, hospitals, almshouses, public water, light, heat, etc.

The amendment of 1913 enlarged the rights of a city to extend its transportation lines as far as 10 miles beyond its boundaries, and in that connection subdivision (*i*) of section 4 (Act No. 5, Pub. Acts 1913) was amended, authorizing cities to incur indebtedness, among other things—

"for the purchase or condemnation of the franchises, if any exist, and of property used in the operation of companies or individuals engaged in the plank road, cemetery, hospital, almshouse, electric light, gas, heat, water and power business, and in cities having not less than 25,000 inhabitants the purchase of the franchise, if any, and the property of street railway and tram railway companies; State and county taxes shall be paid upon such transportation property so purchased and owned by any such city; also local taxes on any portion of such property lying outside of city limits the same as would be paid by private corporations."

It is contended that the closing provision imposing local taxes on any portion of "*such* property lying outside the city limits" was intended to and does include all property before enumerated.

Bearing in mind the distinction previously made between street car lines and other municipal utilities and applying the unquestioned rule of grammar, which has been crystallized into a legal maxim, that relative words must ordinarily be referred to the next antecedent where the intent, upon the whole instrument, does

not appear to the contrary, we think the conclusion is unavoidable that the word "such" in the connection used refers only to transportation property to the exclusion of that more remotely mentioned.

"The word ['such'] is descriptive, and is a relative word, and as such must be referred to the last antecedent, unless the meaning of the sentence would thereby be impaired. * * * This construction is not only in subordination to the maxim, '*Ad proximum antecedens nisi impediatur sententiæ,*' but is in perfect harmony with both the preceding sections of the act." *Summerman* v. *Knowles*, 33 N. J. Law, 202.

The last antecedent is the last word which can be made an antecedent, without impairing the meaning of the sentence. Broom's Legal Maxims [7th Am. Ed.], p. 680. Had it been the intention of the legislature to subject to taxation all those paramount public necessities and activities before almost universally recognized as exempt, such as cemeteries, hospitals, almshouses, water, electric light, etc., we cannot assume that so radical legislation would have been thus obscurely expressed, in disregard of grammatical rules, legal maxims, and well-established principles of construction. Further light is thrown upon this inquiry by the amendment of said subdivision (*i*) in Act No. 210, Pub. Acts 1915, which elaborates the subject more fully. After authorizing the purchase or condemnation of franchises and property enumerated as before, it makes provision for an election upon the proposition, and in case of adoption requires a sinking fund to be provided and civil service to be inaugurated, finally in a separate sentence taking up the matter of taxation as follows:

"When a transportation utility is so acquired, State and county taxes shall be paid thereon as if privately owned, also local taxation on any portion of such property lying outside of city limits."

The most reasonable and natural construction of said subdivision (*i*), as found both in the amendments of 1913 and 1915, is that transportation utilities owned and operated by a municipality, whether inside or outside of its limits, are taxable—that part within the limits for State and county taxes only, and that part extending beyond its limits for all purposes—as if owned by private parties. To construe it as contended for by defendant would sweep into the net all public utilities and activities mentioned in said subdivision, including cemeteries, hospitals, and almshouses, charitable or eleemosynary institutions, universally held as exempt from taxation when publicly owned, giving rise to confusion and numerous inconsistencies.

The exemption clause under consideration, re-enacted as late as 1913, is not confined to property within the bounds of the municipality which owns it. By the established rules of construction which certainty and uniformity demand for the interpretation of legal instruments or public acts, said subdivision (*i*) must be construed as taxing one class of public utilities belonging to cities to the exclusion of the rest. The wisdom or justice of this is a legislative, and not a judicial, question.

It is contended that this property is not all used for public purposes, because it appears that the dam, buildings, and mill pond occupy but about 15 acres of the 60-acre tract. It is shown that the Boardman river, upon which the plant is located, runs irregularly through the whole 60 acres, the dam and power house being on the lower 20, with the pond extending upstream to the farther limits of the upper 40, affecting to a greater or less extent the entire tract through which it meanders. The property was purchased for and devoted to an hydraulic development, the dam of which raised the water upon and necessarily affected the character of the property for the entire length of

the river within its limits. Aside from its use for water power the value of the property is relatively small. Without the ownership and control of a sufficient shore acreage along the river beyond the land actually covered by water, such a' development would not be practicable. The advisability and necessity of securing a reasonable amount of land as an integral part of the plant to obviate injury to adjacent owners and protect the project is illustrated by the experience of plaintiff's predecessor with this very property, as appears in *Morrison* v. *Light & Power Co.*, 181 Mich. 624 (148 N. W. 354). Under the circumstances shown the subdivisions acquired by plaintiff cannot be considered unnecessary or excessive for the protection and successful operation of the plant, but can fairly be regarded as an essential part of it, devoted to and used for public purposes. Aside from this, no finding was requested, or made by the trial court, that only a portion of the property was necessary or used for the purposes of the plant, and the court's decision does not appear to be based upon or take into consideration such conditions.

Upon this record under the present condition of the law we are constrained to sustain the contention of plaintiff that the property in question is within the meaning of the tax law used for public purposes, and exempt from taxation.

The judgment is reversed, and a retrial granted.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, BROOKE, and PERSON, JJ., concurred.