SAULT STE. MARIE CITY COMMISSION *v.* SAULT STE.
MARIE CITY ATTORNEY.

1. CONSTITUTIONAL LAW—CONSTRUCTION—HOME-RULE CITIES—MORT-
GAGE BONDS.

The provision of the Constitution authorizing cities or villages
to acquire or operate public utilities and issue mortgage bonds
therefor beyond the general limit of bonded indebtedness pre-
scribed by law but subject to certain restrictions upon such
mortgage bonds must be considered in connection with other
provisions of the Constitution relating to cities and villages
and with the home-rule act for cities enacted pursuant thereto
in suit wherein it is asserted such constitutional provision is
self-executing (Const. 1908, art. 8, §§ 20, 21, 24; 1 Comp.
Laws 1929, § 2228 *et seq.*).

2. MUNICIPAL CORPORATIONS—PUBLIC UTILITIES—GENERAL STATUTES.
The constitutional authorization of municipal utilities is not
self-executing but constituted a general grant of powers to
cities and villages which were intended to be implemented by
general statutes outlining and defining the course to be fol-
lowed, within certain limits, and delineating the sphere of mu-
nicipal action in comprehensive terms (Const. 1908, art. 8,
§§ 23–25).

3. SAME—CONSTITUTIONAL AUTHORIZATION—PUBLIC UTILITIES—STAT-
UTES.

The constitutional authorization of municipal utilities is not self-
executing, and except as legislative enactments enabling cities
and villages to acquire and conduct them contravene consti-
tutional provisions, they are valid (Const. 1908, art. 8,
§§ 23–25).

4. SAME—CONSTITUTIONAL AUTHORIZATION—PUBLIC UTILITIES—REVE-
NUE BONDS—STATUTES.

The constitutional authorization of municipal utilities does not,
alone, give a home-rule city the power to purchase a public
utility and issue proposed revenue bonds, observance of general

statutes implementing such power being also required (Const. 1908, art. 8, §§ 23–25).

5. SAME—GENERAL STATUTES—CHARTERS.

Notwithstanding the fact that the present Constitution has pointed out the extent of local powers and capacities of cities and villages with more precision than has formerly been done, the present Constitution does vest the legislative power in the legislature, maintaining in it the general control over cities and directing it to provide by general law for incorporation of cities under which the electors are given authority to frame, adopt and amend their charters subject to the Constitution and general laws of the State (Const. 1908, art. 8, §§ 20–25).

6. SAME—CHARTERS—GENERAL GRANT OF POWER—HOME-RULE CITY ACT—ELECTRIC-LIGHT PLANT AND SYSTEM.

Notwithstanding provision of home-rule city charter that it should "have and may exercise all powers which now or hereafter it would be competent for this charter specifically to enumerate," where city seeks to acquire electric-light plant and system and issue revenue bonds therefor and home-rule city act authorizes specific charter provision therefor, the charter should be amended so to incorporate such powers in the charter expressly (1 Comp. Laws 1929, §§ 2233, 2236; Sault Ste. Marie Charter, § 3).

7. SAME—HOME-RULE CITY ACT—PURCHASE OF ELECTRIC-LIGHT PLANT AND SYSTEM—APPROVAL OF CONTRACT.

Under the home-rule city act a city may submit an amendment to its charter to the electors to authorize purchase of an electric-light plant and system and at the same election submit to the electorate a proposition to make a particular contract within the scope of the proposed amendment (1 Comp. Laws 1929, §§ 2233, 2236).

8. SAME—MUNICIPAL FINANCE ACT—REVENUE BONDS—SALES—EXCHANGES.

Provisions of municipal finance act requiring offer at public sale of a bond issue of $10,000 or more applies not only to sales for cash but also bonds to be delivered in exchange for property and specifically to mortgage revenue bonds issued by any municipality (Act No. 202, chap. 3, § 2, Pub. Acts 1943, as amended by Act No. 300, Pub. Acts 1945).

9. SAME—EXCHANGE OF REVENUE BONDS FOR ELECTRIC-LIGHT PLANT AND SYSTEM—PUBLIC SALE—MUNICIPAL FINANCE ACT.

A proposed exchange of a city's revenue bonds for the stock of a corporation owning an electric-light plant and system would

constitute a sale but not a public one as required by the municipal finance act (Act No. 202, chap. 3, § 2, Pub. Acts 1943, as amended by Act No. 300, Pub. Acts 1945).

10. EXCHANGE OF PROPERTY—CONSTRUCTION OF CONTRACTS—SALES.
   The legal effect of a contract of exchange is generally the same as that of a contract of sale, an exchange being recognized as two sales or a double sale, the term "sale" being construed as including an "exchange."

11. MUNICIPAL CORPORATIONS—EXCHANGES—REFUNDING BONDS—MORTGAGE REVENUE BONDS EXCHANGED FOR ELECTRIC-LIGHT PLANT AND SYSTEM.
   Provision of municipal finance act relating to the sale or exchange of refunding bonds has no application to transaction whereby it was proposed to exchange mortgage revenue bonds for stock of corporation owning electric-light plant and system (Act No. 202, chap. 6, § 10, Pub. Acts 1943, as amended by Act No. 300, Pub. Acts 1945).

12. SAME—ELECTRICITY—DURATION OF CONTRACTS—STATUTES.
   A proposed contract with a home-rule city for the purchase of electricity is subject to 10-year limitation on duration applicable to contracts for public lighting since statutory provision relating to contracts for "lighting" and for the furnishing of "electric * * * lights" would include contracts for the furnishing of electricity to the city for its lighting purposes (1 Comp. Laws 1929, §§ 2411, 2412).

13. SAME—ELECTRIC-LIGHT PLANT—CONTRACT FOR ELECTRICITY.
   While a city may purchase or construct and operate works for supplying it and its inhabitants with electric lights or contract for the furnishing thereof, if the latter course be chosen, the contract for such purpose may not be for more than 10 years, hence a city cannot legally enter into a proposed 25-year contract for such purpose (1 Comp. Laws 1929, §§ 2411, 2412).

14. SAME—CHARTERS—CONTRACTS—COMPETITIVE BIDDING—ACTUAL COMPETITION.
   Under charter provisions setting forth that expenditures "of $500 or more shall be awarded only * * * upon competitive bidding," a proposed contract for supplying electricity which involved an expenditure in excess of $500 would be void if such mandatory provision were not followed as it is designed for the protection of the public and to prevent favoritism, corruption, extravagance, and improvidence and may not be evaded merely because there may be only one party in a position to enter into such a contract (Sault Ste. Marie Charter, §§ 27, 127).

15. SAME—CHARTER—CONTRACTS—OPPORTUNITY FOR COMPETITIVE BIDDING.

Under a municipal charter provision requiring competitive bidding in the letting of certain contracts, where applicable it is sufficient if an opportunity for competitive bidding is afforded, even though only one bid is filed and there is no actual competition (Sault Ste. Marie Charter, §§ 27, 127).

16. MANDAMUS—APPROVAL OF CONTRACT WITH HOME-RULE CITY BY CITY ATTORNEY—QUESTIONS REVIEWABLE.

Whether or not approval of city attorney of contract to furnish electricity to home-rule city is a ministerial act which could be compelled by mandamus is not passed upon where a legal duty to approve proposed contract has not been established, the writ being, therefore, denied, and the question is not raised.

17. COSTS—PUBLIC QUESTION—APPROVAL OF CONTRACT FOR FURNISHING ELECTRICITY TO HOME-RULE CITY.

No costs are allowed in mandamus proceeding by city commission to compel city attorney to approve proposed contract with city for furnishing electricity, public questions being involved.

Mandamus by Maurice E. Hunt, Mayor, and others constituting the Commission of the City of Sault Ste. Marie, to compel James J. Fenlon, City Attorney of the City of Sault Ste. Marie, to approve a proposed contract between the city and American States Utilities Corporation. Submitted October 9, 1945. (Calendar No. 43,120.) Writ denied March 4, 1946.

*Berry & Stevens* (*Claude H. Stevens*, of counsel), for plaintiffs.

*James J. Fenlon, in pro. per.*

STARR, J. On June 9, 1945, plaintiff commissioners of the city of Sault Ste. Marie, a municipal corporation organized and existing under the home-rule act,* filed petition in this Court for a writ of mandamus to compel defendant, city attorney, to approve certain contracts relating to the acquisition

---

* 1 Comp. Laws 1929, § 2228 *et seq.* (Stat. Ann. § 5.2071 *et seq.*).

by the city of an electric-light plant and system, the issuance of revenue bonds, and the purchase of electricity. In response to an order to show cause defendant answered, admitting the facts set forth in the petition, but denying plaintiffs' right to the writ on the ground that the proposed contracts and issuance of bonds would be illegal. The present proceedings are for the purpose of determining the legality of said contracts and revenue bonds.

From the petition it appears that the Edison Sault Electric Company (herein referred to as the Edison company) now furnishes electricity to the city and its inhabitants and also to other municipalities and consumers in territory outside the city. The company owns a generating plant and distribution system in the city and also a distribution system outside the city, but operates the plant only as a "stand-by" and obtains the principal amount of its electricity from its operation, under lease, of a hydroelectric plant owned by the United States of America. All the common stock of the Edison company is owned by the American States Utilities Corporation, a Maryland corporation, and the Federal securities and exchange commission has ordered it to dispose of its interest in the Edison Company within a limited time. In their petition plaintiffs allege that the city desires to purchase the generating plant and distribution system located within its corporate limits but that the American States corporation will not sell the properties of the Edison company in parcels. They further allege that said corporation will sell the properties of the Edison company only in their entirety through a sale of the common stock of that company. However, it appears that the city could not own and operate the entire properties of the Edison company, because such operation would result in the

city's selling and delivering electricity *without* its corporate limits in an amount in·excess of 25 per cent. of that furnished *within* its limits, in violation of Constitution of 1908, art. 8, § 23, as amended in 1944.*

Plaintiff commissioners allege that in pursuance of a negotiated plan for the city to acquire the generating plant and distribution system located *within* its corporate limits, they unanimously adopted a resolution on May 25, 1945, which provided in part:

"SECTION 1.   That the city shall enter into a·contract with American States Utilities· Corporation in the following form and that the mayor and city clerk are hereby authorized, directed and instructed, in behalf of the city of Sault Ste. Marie, to execute such contract:   *   *   *

" 'American States Utilities Corporation:   *   *   *

" 'The city of Sault Ste. Marie, Michigan, hereby offers to·purchase from you all the issued and outstanding common stock of Edison Sault Electric Company (hereinafter referred to as "the company"), consisting of 34,400 shares, for the sum of $1,500,000, provided however, that the city shall not be under obligation to consummate the transaction if the appraisal of the properties of the company which is now being made for the city by R. W. Beck & Company does not, when completed, recommend the purchase of the said stock at said price.

" 'It is understood that payment for such stock is to be made by the city through the delivery to you of its mortgage revenue bonds in the above

---

* This section provides in part as follows:

"Subject to the provisions of this Constitution, any city or village may acquire, own and operate, either within or without its corporate limits, public utilities for supplying water, light, heat, power and transportation to the municipality and the inhabitants thereof; and may also sell and deliver heat, power and light *without* its corporate limits to· an amount not to exceed 25 per cent. of that furnished by it within the corporate limits."

amount (if and when the issuance of such bonds is properly authorized by a sufficient majority of the qualified electors of said city), which bonds shall be dated July 1, 1945, shall bear interest at the rate of three per cent. per annum. [Provisions relative to the maturity and redemption of said bonds.] * * *

" 'Said bonds are to be secured by mortgage on the electric system acquired by the city, which mortgage shall contain the customary provisions and shall be satisfactory to you, and said bonds when tendered to you for delivery are to be accompanied by the legal opinion of Messrs. Chapman and Cutler of Chicago, Illinois, approving the legality of said bonds and approving the provisions of said mortgage. [Provisions relative to the determination of the company's net-current-asset position at the time of closing the deal.] * * *

" 'Your acceptance of this proposal shall be considered to constitute this proposal and your acceptance a contract between you and the city of Sault Ste. Marie.' [Blanks for signatures of parties and for the city attorney's approval of contract.] * * *

"Sec. 2. That when there shall be submitted to the city of Sault Ste. Marie by a solvent and responsible corporation authorized to operate utility properties in the State of Michigan, a proposal covering substantially the following points, the mayor and city clerk are hereby authorized in behalf of the city of Sault Ste. Marie to accept such proposal, but subject to ratification of the details thereof by resolution to be adopted by the commission:

"1. The corporation is to purchase from Edison Sault Electric Company at the time of closing, the properties of Edison Sault Electric Company lying outside the city limits of Sault Ste. Marie which are not desired to be owned and operated by the city.

"2. The corporation is to pay therefor the sum of $1,000,000, which sum is to be paid the city in cash at the time of closing and is to be used in retiring the outstanding mortgage indebtedness" [of

the Edison Company] ''which presently constitutes an encumbrance against the property.

''3.   The corporation is to lease from the United States of America and is to operate for a period of not less than 25 years, the hydroelectric plant which now supplies most of the electricity distributed over the system of Edison Sault Electric Company.

''4.   The corporation is to agree to sell electricity at wholesale to the city for said 25-year period, and the city is to agree to purchase from the corporation during such period all electricity which is distributed by the city over its distribution system except such electricity as may be necessarily generated by the city's steam stand-by plant as an incident to the maintenance of said stand-by plant in a 'ready to serve condition.'   Payment by the city for the electricity so purchased shall be made from the revenues derived by the city from the resale of such electricity, and the city shall be under no obligation to pay for such electricity from any other funds.

''5.   Electricity so sold the city by the corporation is to be at a price acceptable to the city.

''6.   The corporation is, as a part of its agreement with the city, to enter into such arrangement with the city for the operation by the city of the city's steam stand-by plant as will assure the use of said plant to the best mutual advantage of the city and the corporation.

''Sec. 3.   That when the contract for which provision is made in section 1 hereof shall have been executed by the mayor and city clerk and by the officials of American States Utilities Corporation, provision shall immediately be made by the city for the calling of a special election at which there shall be submitted to the electors of the city, qualified to vote thereon under the Constitution and laws of Michigan, the questions of the acquisition of the electric properties which the city desires to acquire, the issuance of the city's mortgage revenue bonds in payment therefor, the granting of a franchise to

any purchaser who might purchase said properties under the mortgage securing said bonds, and any other proposition which may be required to be submitted to the electors in connection with the consummation of the project.

"Sec. 4. That if the propositions specified in section 3 hereof are carried at said election by the requisite majority of the electors voting thereon, the commission will then proceed with the authorization of the mortgage bonds. When said bonds shall have been authorized and prepared, and when the contract contemplated by section 2 hereof shall have been approved by the commission and executed, the commission will then proceed with the consummation of the transaction and the mayor and city clerk and all other officials of the city of Sault Ste. Marie are hereby directed to proceed forthwith with the carrying out of the transaction as outlined in this resolution, to the end that the city may acquire its contemplated electric plant and system as speedily as possible and within the time limit specified in the contract set forth in section 1 hereof."

Under section 42 of the city's charter, the contracts authorized by the above-quoted resolution would not be effective and binding until defendant city attorney indorsed his approval thereon. Said section 42 provides in part:

"The commission shall appoint a city attorney who shall hold office at the pleasure of the commission. He shall act as the adviser to, and attorney and counsel for, the municipality and all its officers in matters relating to their official duties. He shall prepare all contracts, bonds, and other instruments in writing in which the municipality is concerned, and shall indorse on each his approval of the form and correctness thereof; and no contract with such municipality shall take effect until his approval is indorsed thereon."

On May 26, 1945, defendant city attorney advised the commission by written communication that he would not approve the proposed contracts and considered them invalid for the following reasons:

"1.   The city cannot legally issue the mortgage revenue bonds which are to be issued to pay for the property to be acquired, since there is no provision in the city charter authorizing the issuance of such bonds, there is no general statute of the State of Michigan applicable to the city of Sault Ste. Marie which authorizes the issuance of such bonds and Constitution of 1908, art. 8, § 24, is not self-executing.

"2.   Even could said mortgage revenue bonds be validly authorized by the city, they cannot be delivered to American States Utilities Corporation in the manner contemplated by said contract, but must be offered at public sale as required by Act No. 202, chap. 3, § 2, Pub. Acts 1943, as amended by Act No. 300, Pub. Acts 1945 (Comp. Laws Supp. 1945, § 2689–42, Stat. Ann. 1945 Cum. Supp. § 5.3188 [7]).

"3.   The agreement contemplated by section 2 of the aforesaid resolution, and which constitutes an integral and necessary part of the proposed procedure, will, if entered into as contemplated by said section, be invalid and ineffective because (a) the city, under its charter and the existing laws of Michigan, has no authority to enter into a long term contract for the purchase of electricity for distribution to the inhabitants of the city, (b) said agreement will run for a period of more than 10 years, contrary to the requirement of 1 Comp. Laws 1929, § 2412 (Stat. Ann. § 5.2472), (c) it is provided in section 27 and section 127 of the city charter that no contract involving the expenditure of more than $500 may be awarded except upon competitive bidding.   The aforesaid resolution authorizing this agreement clearly indicates that competitive bids

for the contract are not contemplated, thus violating the provisions of said sections 27 and 127 of the charter.''

Plaintiffs first contend that Constitution of 1908, art. 8, § 24, is self-executing and gives the city full authority to purchase the public utility and issue the revenue bonds as provided in the commission's resolution of May 25th. Said section 24 provides:

"When a city or village is authorized to acquire or operate any public utility, it may issue mortgage bonds therefor beyond the general limit of bonded indebtedness prescribed by law: Provided, That such mortgage bonds issued beyond the general limit of bonded indebtedness prescribed by law shall not impose any liability upon such city or village, but shall be secured only upon the property and revenues of such public utility, including a franchise stating the terms upon which, in case of foreclosure, the purchaser may operate the same, which franchise shall in no case extend for a longer period than 20 years from the date of the sale of such utility and franchise on foreclosure."

The above section must be considered in connection with other provisions of the Constitution relating to cities and villages (*Lake Superior District Power Co.* v. *City of Bessemer*, 288 Mich. 455) and in connection with the provisions of the above-cited home-rule act for cities. Article 8, § 20, states that the legislature shall provide by general law for the incorporation of cities and villages and that such general laws shall limit their rate of taxation for municipal purposes and restrict their powers of borrowing money and contracting debts. Article 8, § 21, provides that under such general laws the electors of each city or village shall have the power to frame, adopt, and amend its charter and "through its regularly-constituted authority, to pass all laws and ordinances relating to its municipal concerns,

subject to the Constitution and general laws of this State.'' In pursuance of these constitutional provisions the legislature passed the home-rule act for cities, thereby granting them autonomy relative to certain of their municipal concerns. *Barnhart* v. *City of Grand Rapids*, 237 Mich. 90. Among other things, the act gave a city permissive authority to provide in its charter for the purchase and operation of public-utility properties for supplying light, power or transportation to the city and its inhabitants, and for the issuance of revenue bonds. Section 4–c * of the act provides:

''Each city which is authorized to acquire, own, purchase, construct or operate any public utility, *may provide in its charter* for the issuance of mortgage bonds therefor beyond the general limit of the bonded indebtedness prescribed by law, provided that such mortgage bonds issued beyond the general limit of bonded indebtedness prescribed by law shall not impose any liability upon such city but shall be secured only upon the property and revenues of such public utility, including a franchise, stating the terms upon which, in case of foreclosure, the purchaser may operate the same, which franchise shall in no case extend for a longer period than 20 years from the date of the sale of such utility and franchise on foreclosure. Such mortgage bonds shall be sold to yield not to exceed six per centum per annum. The charter shall also provide for the creation of a sinking fund in the event of the issuance of such bonds, by setting aside such percentage of the gross or net earnings of the public utility as may be deemed sufficient for the payment of the mortgage bonds at maturity.''

Section 4–f † of the act provides in part:

''Each city may in its charter provide: For the purchase or condemnation of the franchises, if any

---

\* 1 Comp. Laws 1929, § 2233 (Stat. Ann. § 5.2076).—Reporter.
† 1 Comp. Laws 1929, § 2236 (Stat. Ann. § 5.2079).—Reporter.

exist, and of the property used in the operation of companies or individuals engaged in the   *   *   * electric light, gas, heat, water and power business. *   *   *   And each city may in its charter provide that it may make a contract, upon such terms, including terms of present or deferred payment, and upon such conditions and in such manner as the municipality may deem proper, to purchase, operate and maintain any existing public utility property for supplying water, heat, light, power or transportation to the city and the inhabitants thereof. No such contract shall bind the municipality unless the proposition therefor shall receive the affirmative vote of three-fifths of the electors voting thereon at a regular or special election."

Said section 4–f of the act further states that each city may in its charter provide:

"(3) For the purchase and condemnation of private property for any public use or purpose within the scope of its powers; also for the acquirement, ownership, establishment, construction and operation, either within or without its corporate limits, of public utilities for supplying water, light, heat, power and transportation to the municipality and the inhabitants thereof, for domestic, commercial and municipal purposes.   *   *   *   The acquirement of any such utility together with all properties, franchises, and rights   *   *   *   may be either by purchase or condemnation."

Section 24 of article 8 of the Constitution, like sections 22 and 23, constituted a grant of general powers to cities and villages, which were intended to be implemented by legislative enactments. The home-rule act defined and implemented such general powers. In holding that article 8, §20, of the Constitution was not self-executing, we said in *Gallup* v. *City of Saginaw*, 170 Mich. 195, 199, 200:

"The framers of the Constitution, in departing from the old order of things and providing for what

is popularly known as 'home rule' or 'freeholder's charters,' thereby granting autonomy to municipalities, did not deem it wise to make the constitutional provision on the subject *self-executing,* but required a preliminary, general law to be passed, outlining and defining the course to be followed, within certain limits, delineating the sphere of municipal action in comprehensive terms. The new system is one of general grant of rights and powers."

See, also, *People* v. *Sell,* 310 Mich. 305; *City of Pontiac* v. *Ducharme,* 278 Mich. 474; *City Commission of Jackson* v. *Hirschman,* 253 Mich. 596.

In *Wood* v. *City of Detroit,* 188 Mich. 547, 558, 559 (L. R. A. 1916 C, 388), we said:

"The Constitution of 1908 has pointed out the extent of the local powers and capacities of cities and villages with more precision than was done in former Constitutions, * * * but it has not abolished all distinctions between municipal and other corporations and individuals with respect to the exercise of the powers conferred nor denied the power of the legislature to enact general laws applicable to cities."

Article 8, § 22, of the Constitution provides that "any city or village may acquire, own, establish and maintain *, * * parks, boulevards, cemeteries, hospitals, almshouses and all works which involve the public health or safety." In determining that said section was not self-executing, we said in *City of Detroit* v. *Oakland Circuit Judge,* 237 Mich. 446, 449–451:

"It is certain that this section of the Constitution gives to cities and villages the right to own, establish, and maintain parks outside of the corporate limits. But the legislative power is vested by the Constitution in the legislature, which maintains general control over cities, and which was directed by the Constitution to provide by a general law for

the incorporation of cities, under which the electors were given authority to frame, adopt, and amend their charters, subject to the Constitution and the general laws of the State.    *    *    *

"The section is not self-executing as it 'merely lays down a general principle,' and provides no means for the enjoyment of the right without 'the aid of legislative enactment.' "

In *City of Kalamazoo* v. *Titus,* 208 Mich. 252, 265, we said:

"The impressive thing about these constitutional provisions (art. 8, §§ 20, 21, 22, 23, 24, 25, and 28) is that they recognize and affirm the theory that cities owe their origin and their powers to the legislature. And while cities may refer power to do some things, as, for example, power to acquire certain public works, directly to some of these constitutional provisions, it must be admitted that all of these provisions should be considered with reference to the fact that legislative power is vested in the legislature and that the Constitution recognizes, as former Constitutions have recognized, the general control of the legislature over cities. That the legislative power ought to be exercised in such manner as to preserve the right of local self-government is a doctrine which in application in no way modifies or qualifies the idea of the general legislative power of creation and control."

In *City of Bay City* v. *State Board of Tax Administration,* 292 Mich. 241, 257, we said:

"*The constitutional authorization of municipal utilities is not self-executing.* Instead, numerous legislative enactments have been found necessary to provide the means and method of enabling cities and villages to acquire and conduct such utilities. *    *    * Except such legislative enactments contravene constitutional provisions, they are valid. *Stanhope* v. *Village of Hart,* 233 Mich. 206, upon

which appellants rely, is by no means as broad in its decision as appellants infer, and does not sustain their claim that article 8, §§ 23, 24 and 25 of the Constitution are self-executing.''

We conclude that article 8, § 24, is not self-executing and does not give the city of Sault Ste. Marie power to purchase the public utility and issue the proposed revenue bonds in question.

The plaintiffs and defendant both request that we determine certain other questions in order that they may have guidance in their future plans for the acquisition of the utility in question and the issuance of revenue bonds in payment therefor. Section 3 of the city's charter provides that "it shall have and may exercise all powers which now or hereafter it would be competent for this charter specifically to enumerate." However, we conclude that if the city desires to enter into the proposed contracts relating to the acquisition of an electric-light plant and system and the issuance of revenue bonds, it should amend its charter and proceed in accordance with the provisions of sections 4–c and 4–f of the home-rule act. These sections of the act expressly authorize a home-rule city to provide in its charter for the purchase of the property used in the operation of a company engaged in (among other things) the electric-light and power business and for the issuance of revenue bonds. Section 4–f further provides that "when a vote is taken to amend a city charter for the purpose of acquiring any of the above-mentioned powers, a vote may also, by direction of the legislative body of the city, be taken at the same election upon a proposition to make a particular contract within the scope of said proposed amendment."

Plaintiffs raise question as to whether the proposed revenue bonds, if legally authorized, could be

delivered to the American States Utilities Corporation in exchange for an electric-light plant and system, or whether said bonds must be offered at public sale under Act No. 202, chap. 3, § 2, Pub. Acts 1943, as amended by Act No. 300, Pub. Acts 1945 (Comp. Laws Supp. 1945, § 2689-42, Stat. Ann. 1945 Cum. Supp. § 5.3188 [7]) (municipal finance act). Said section provides in part:

"Obligations of an authorized issue of $10,000 or more *shall be sold*, except as herein provided, *at public sale.* * * * No municipality shall advertise its proposed obligations for sale until it shall have first secured the approval of the (municipal finance) commission to the notice of the sale to be published.

"If the municipality shall have received a bid or bids at the time fixed for public sale which shall have been rejected by the governing body, then such obligations may be sold at private sale within 30 days thereafter at a price not less than the highest bid received at such public offering, or if the municipality shall have offered the obligations at 2 public offerings and shall not have received at the latter any bid or any bid satisfactory to the governing body, then such obligations may be sold at private sale within 30 days after such last public offering at a price not less than the highest bid, if any, received at such last public offering.

"*The provisions of this section shall be applicable to mortgage revenue bonds to be issued by any municipality.*"

Plaintiffs contend that these provisions apply only to municipal bonds to be sold for cash and do not apply to bonds to be delivered in exchange for property, as is proposed by the city in the case at hand. We find no sound basis for this contention. The statute expressly states that it applies "to mortgage revenue bonds to be issued by any municipality." The proposed exchange of the city's

revenue bonds for the stock of the Edison company would constitute a sale but not a "public sale" as required by the statute.   In 33 C. J. S. p. 5, it is stated:

"It has frequently been held or stated that there is no substantial difference between a sale and an exchange; and the legal effect of a contract of exchange is generally the same as that of a contract of sale.   In both cases the title is absolutely transferred and both transactions are governed by the same rules of law practically.   In law an exchange is recognized as two sales or a double sale, and an exchange of real estate is as to each one of the parties a sale and purchase of property.   The term 'sale' may be construed as including an exchange, particularly under statutes so providing, and indeed exchanges are frequently denominated 'sales.'"

See, also, *Edward* v. *Ioor*, 205 Mich. 617 (15 A. L. R. 256).

Chapter 6, § 10, of the municipal finance act * relating to the sale or exchange of refunding bonds has no application to the situation before us.   We conclude that the proposed revenue bonds, if legally authorized, could not be delivered to the American States Utilities Corporation in exchange for the common stock of the Edison Company, but that they must be offered at public sale in the manner required by the municipal finance act.

The next question presented is whether or not the city can legally enter into the proposed contract whereby it agrees that for a period of 25 years it will purchase from a private corporation "all electricity" for distribution to itself and its inhabitants, except such as may necessarily be generated by the stand-by plant in maintaining it in a ready-to-serve condition.   1 Comp. Laws 1929, § 2411 (Stat. Ann. § 5.2471), authorizes a city to purchase or to con-

---

* As amended by Act No. 300, Pub. Acts 1945 (Comp. Laws Supp. 1945, § 2689–80, Stat. Ann. 1945 Cum. Supp. § 5.3188[37]).—RE-PORTER.

struct and operate works for the purpose of supplying it and its inhabitants with gas, electric or other lights, or "to contract for the furnishing thereof." 1 Comp. Laws 1929, § 2412 (Stat. Ann. § 5.2472); provides "that all contracts for lighting such cities or villages   *   *   *   shall be for a period of not less than three nor more than ten years: And *   *   * `that such contract shall be entered into in the manner prescribed by the charter of such city or village for the letting of contracts for public lighting." Plaintiffs argue that the above provisions are not applicable to the proposed contract, because the city is contracting for the purchase of electricity and not for the furnishing of electric lights. This argument is without merit, because these provisions relating to contracts for "lighting" and for the furnishing of "electric   *   *   * lights" would at least include contracts for the furnishing of electricity to the city for its lighting purposes. These statutory provisions, when considered together, clearly indicate that contracts for the furnishing of electricity to "cities or villages and the inhabitants thereof" shall be for not more than 10 years. We conclude that the city of Sault Ste. Marie cannot legally enter into the proposed 25-year contract for the purchase of electricity for distribution to itself and its inhabitants. In view of this conclusion, questions relative to the reasonableness of the proposed contract do not require consideration.

The next question presented is whether or not the proposed 25-year contract for the purchase of electricity comes within the following provisions of the city charter requiring competitive bidding:

"SEC. 27. *All contracts involving an expenditure of $500 or more shall be awarded only* upon recommendation of the city manager, approval by the commission, and *upon competitive bids therefor.*"

"Sec. 127. When an expenditure, other than the compensation of persons employed by the city, exceeds $500, such expenditure shall first be authorized and directed by ordinance or resolution of the commission and no contract involving an expenditure in excess of such sum shall be made or awarded except upon the approval of the city manager and the commission, and upon competitive bidding."

Plaintiffs argue that it would be useless to require competitive bidding for the furnishing of electricity to the city, because the proposed private corporation operating the Federally-owned hydroelectric plant would be the only company having the facilities to generate and deliver electricity. To hold with this argument would evade the mandatory provisions of the charter relative to competitive bidding. The only test under the charter provisions is whether the contract involves "an expenditure of $500 or more." The proposed contract would involve an expenditure in excess of that amount, and the number of the sources of supply of electricity is immaterial. Further, it cannot be assumed that the proposed private corporation would be the only source of supply and that there would be no competitive bidders. Our decision in the case of *City of Saginaw* v. *Consumers' Power Co.*, 213 Mich. 460, is determinative of the question before us. In that case the charter of the city of Saginaw provided that no contract for expenditure by the city of a sum exceeding $250 should be entered into unless the contract was let upon competitive bids. In considering the question as to whether or not a contract for the purchase of electricity for city purposes came within said provision requiring competitive bidding, we said (pp. 478, 480, 481):

"The power company was then in absolute control of the lighting and power situation at Saginaw; it had no competitors.    *    *    *

"Is the provision of the charter of the city of Saginaw now under consideration a mandatory or a directory provision? The provision requiring competitive bidding is one common to most municipal charters. It is a provision designed for the protection of the public. Speaking of such provisions, it is said in 20 Am. & Eng. Enc. Law (2d Ed.), p. 1165:

" 'The object of such provisions is, it has been said, to "prevent favoritism, corruption, extravagance, and improvidence" in the awarding of municipal contracts, and they should be so administered and construed as fairly and reasonably to accomplish such purpose.'

"*That a provision requiring competitive bidding is mandatory, that the municipality is not bound by contracts made in defiance of it, finds support in the great weight of authority and is in accordance with the holdings of this court.* (Authorities cited.)
\* \* \*

"The city was not, and is not, bound by its contract made with the power company without competitive bidding and in violation of the mandatory provision of its charter."

See, also, *Attorney General, ex rel. Allis-Chalmers Co.,* v. *Public Lighting Commission of City of Detroit,* 155 Mich. 207.

In 44 C. J. pp. 324–326, it is stated:

"It is commonly provided by statute, charter, or ordinance that, at least in certain cases, a municipal contract for a public work or improvement shall be let upon competitive bidding. Such a provision, when applicable, is mandatory; unless it is complied with, the contract is void. \* \* \* This is true both of provisions requiring a notice, request, or advertisement for bids, and of provisions requiring the contract to be awarded to the lowest responsible bidder, as the object of such provisions, considered together, is to procure competitive bidding, \* \* \* and thereby to safeguard public funds by prevent-

ing fraud, favoritism, and extravagance in their expenditure.    *    *    *

"It is sufficient if an opportunity for competitive bidding is afforded, even though only one bid is filed and there is no actual competition."

We conclude that under the above-quoted charter provisions the proposed contract for the purchase of electricity could be awarded only upon competitive bids therefor.

In view of our conclusions, and as it is not raised, we do not pass upon the question as to whether or not defendant's approval of the proposed contracts would be a ministerial act which could be compelled by mandamus.

Plaintiffs have not established a legal duty on the part of the city attorney to approve the contracts in question.   The petition for writ of mandamus is, therefore, denied.   Public questions being involved, no costs are allowed.

BUTZEL, C. J., and CARR, BUSHNELL, SHARPE, BOYLES, REID, and NORTH, JJ., concurred.