ATTORNEY GENERAL, ex rel. LENNANE, v. CITY OF DETROIT.

1. STATES—MAY REGULATE HOURS OF LABOR AND FIX MINIMUM WAGE.

The State may regulate the hours of labor for the State itself and for its municipalities acting under delegated authority and may fix a minimum wage therefor.

2. MUNICIPAL CORPORATIONS — PERFORM DUAL FUNCTIONS — LOCAL
AND AS AGENT OF STATE.

> Municipalities perform dual functions, some local in
> character and others as agents of the State, and while
> the State may not meddle with the purely local affairs
> of municipalities, neither may they arrogate to themselves
> power possessed by the State alone in its sovereign
> capacity.

3. SAME — POWERS DISTINGUISHED.

> In matters of public health, of police, and such activities,
> municipalities act as agents of the State, but in the
> management of water works, electric light plants, etc., of
> which they are proprietors, they act in matters of purely
> local concern as also in numerous other activities per-
> taining to the locality as distinguished from the State at
> large.

4. SAME — GENERAL POLICE POWER NOT DELEGATED BY CONSTITU-
TION OR STATUTE.

> Neither by the Constitution ·(Art. 8, §§ 20, 21) nor by
> the legislation enacted to effectuate the same (1 Comp.
> Laws 1915, § 3304 *et seq.*) is delegated to municipalities
> the general exercise of all of the police power of the
> State.

5. SAME — AS AGENT OF STATE MAY NOT FIX ITS PUBLIC POLICY.

> A municipality may not, as agent of the State, fix for
> the State its public policy in regard to matters not ex-
> pressly delegated to it.

6. SAME — MINIMUM WAGE — PUBLIC POLICY OF STATE NOT DELEGATED
TO CITY.

> Even if it be conceded that the city of Detroit under its
> charter (tit. 9, chap. 2) has the power to fix a minimum
> wage and regulate the hours of work for its own em-
> ployees engaged in matters of purely local concern, it
> may not impose such regulations upon activities which
> are purely of State concern, since in attempting so to do,
> it has undertaken to fix a public policy for the State, a
> power not delegated to it either by the Constitution or
> the home rule act.

Appeal from Wayne; Lamb (Fred S.), J., presid-
ing. Submitted October 17, 1923. (Docket No.
150.) Decided December 19, 1923.

Bill by Merlin Wiley, Attorney General, on the relation of Harold A. Lennane and others, against the city of Detroit to enjoin the enforcement of the "minimum wage" provisions of its charter and ordinance.    From a decree for plaintiff, defendant appeals.    Affirmed.

*Donnelly, Hally, Donnelly & Munro,* for plaintiff.

*Richard I. Lawson,* Corporation Counsel, and *Paul T. Dwyer,* Assistant Corporation Counsel, for defendant.

FELLOWS, J.    The attorney general files this information or bill in equity on the relation of numerous contractors of the city of Detroit, engaged in the performance of contracts with the city in public work, to restrain the city from enforcing the provisions of chapter 2 of title 9 of its charter, entitled: "Minimum Wage," and of an ordinance of the city of similar purport.    The ordinance which contains a penal provision so closely follows the charter provision that it will not be necessary to quote it.    The charter provision is as follows:

"SECTION 1. The service day for all employees of the city of Detroit during which they shall be required to work shall consist of eight consecutive hours in any one day of twenty-four hours.    No employee shall be required or permitted to work for more than this eight-hour service day, except in case of any emergency which would result in serious loss, damage, or impairment of the city's service, unless the same employee or employees were required to remain continuously at work for a longer period, in which case, during the continuance of the emergency, the provision requiring the eight-hour service day may be suspended by the department head or proper subordinate in whose department the emergency shall have arisen.

"SEC. 2. No employee shall be required to work for more than six service days in any consecutive seven days of twenty-four hours each, except in case of any emergency which would result in serious loss, damage.

or impairment of the city's service, unless the same employee or employees were required to remain at work in excess of the six-day service week, in which case during the continuance of the emergency the provision requiring a six-day service week may be suspended by the departmental head or proper subordinate in whose department the emergency shall have arisen.

"Sec. 3. The common council shall by ordinance provide for the proper re-adjustment of service time and for the proper excess of the regular service day or the regular service week shall have been required in the case of any emergency as herein provided. But the common council shall provide for a rate of compensation for excess service which shall be for Sundays and other holidays not less than twice the regular rate of compensation, and for other days not less than one and one-half times the regular rate of compensation.

"Sec. 4. No employee doing common labor shall receive compensation in a sum less than two dollars and twenty-five cents per diem for an eight-hour service day. No employee doing work of a skilled mechanic shall receive compensation in a sum less than the highest prevailing wage in that particular grade of work. Whenever practicable the per diem plan of employing common labor shall be in force. All wages and all salaries shall be paid weekly. Any employee who shall receive compensation for service rendered at a rate less than the minimum fixed herein may by an action for debt recover from the city the balance due him hereunder with costs.

"Sec. 5. No contract for any public work shall be let which shall not, as a part of the specification on which contractors shall make their bids, require contractor or subcontractor to pay all persons in his employ doing common labor and engaged in the public work contracted for not less than two dollars and twenty-five cents per diem, to pay all persons in his employ doing the work of a skilled mechanic and engaged on the public work the highest prevailing wage in that particular grade of work, and to require of such employees the same service day and service week required herein of all city employees. Any contractor who shall have entered into such contract

with the city and shall have violated any provision of this section as made a part of his contract shall be debarred from any further contracts for public work, and any contract let to him contrary to this provision shall be void. Whenever it shall appear that any employee of any contractor for public work engaged thereon shall have received less than the compensation herein provided, the common council may cause to be paid to him such deficit as shall be due him and shall cause the amount so paid to be deducted from the balance due to the contractor from the city."

The record is quite convincing that the city itself has failed to differentiate between an "emergency" and a convenience, and has quite uniformly failed to limit a day's work to 8 hours; it is also quite convincing that the laborers of Detroit prefer a 10-hour day with its added compensation to an 8-hour day. The record also establishes without dispute that the enforcement of the charter provisions and ordinances will add from 10 to 30 per cent. to the cost of all public work in the city. The provisions of the charter and the ordinance are assailed for the following reasons:

"(1) Because the inclusion of chapter 2 of title 9 in the charter of the city of Detroit was in excess of the authority conferred upon the municipality and is therefore *ultra vires*.

"(2) Because the provisions of such chapter are in violation of the Constitution of the United States.

"(3) Because the provisions of said chapter are contrary to the provisions of the Constitution of the State."

These contentions were sustained by the trial judge and the relief prayed was granted.

We are persuaded that the inquiry in this court may be considerably narrowed as a decision of the first question will dispose of the case. That the State may regulate the hours of labor for the State itself and for its municipalities acting under delegated authority and may fix a minimum wage therefor is settled by

*Atkin* v. *Kansas,* 191 U. S. 207 (24 Sup. Ct. 124). That case is bottomed upon the right of the State to declare a public policy for itself and its municipalities in the conduct of public work. We may further narrow the inquiry. Without deciding, but assuming for the purposes of the case that the city may fix a public policy applicable to its matters of local and municipal concern, there is still left the question of the power of the city to declare a public policy applicable to matters of State concern. That the municipality performs dual functions, some local in character, the others as agent of the State, will be presently considered; and while this court from the beginning has vigilantly sustained the right of local self-government, it has with equal vigilance sustained the right of the State in the exercise of its sovereign power. Attempts of the State to meddle with the purely local affairs of a municipality have been promptly checked by this court, and attempts of municipalities to arrogate to themselves power possessed by the State alone in its sovereign capacity must meet a like check at the hands of this court. Neither may trench upon the power possessed by the other alone.

In the case of *Gunther* v. *County Road Com'rs of Cheboygan Co., ante,* 619, handed down herewith, we had occasion to consider the question of whether the board of county road commissioners was performing a governmental function, was a State agency, in maintaining trunk line highways, and held that it was. We there cited and quoted from numerous cases which pointed out the distinction between the duties and powers of municipal corporations when acting as an agent of the State, and when acting as a proprietor and for local purposes. To the quotations there indulged in may be added the clear statement of Judge Dillon found in 1 Dillon on Municipal Corporations (5th Ed.), § 109, as follows:

"In *its governmental or public character,* the corporation is made, by the State, one of its instruments, or the local depositary of certain limited and prescribed political powers, to be exercised for the public good on behalf of the State rather than for itself. In this respect it is assimilated, in its nature and functions, to a county corporation, which, as we have seen, is purely part of the governmental machinery of the sovereignty which creates it. Over all its civil, political, or governmental powers, the authority of the legislature is, in the nature of things, supreme and without limitation, unless the limitation is found in the Constitution of the particular State. But in *its proprietary or private character,* the theory is that the powers are supposed not to be conferred, primarily or chiefly, from considerations connected with the government of the State at large, but for the private advantage of the compact community which is incorporated as a distinct *legal personality or corporate individual;* and as to such powers, and to property acquired thereunder, and contracts made with reference thereto, the corporation is to be regarded *quoad hoc* as a private corporation, or at least not public in the sense that the power of the legislature over it or the rights represented by it, is omnipotent."

In matters of public health, of police and numerous other activities, the municipality acts as an agent of the State. It owns waterworks and electric light plants as proprietor, and its management of them are matters of local concern as are numerous other activities pertaining to the locality as distinguished from the State at large. We quote sections 20 and 21 of article 8 of the Constitution:

"SEC. 20. The legislature shall provide by a general law for the incorporation of cities, and by a general law for the incorporation of villages; such general laws shall limit their rate of taxation for municipal purposes, and restrict their powers of borrowing money and contracting debts.

"SEC. 21. Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter and to amend

an existing charter of the city or village heretofore granted or passed by the legislature for the government of the city or village, and, through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the Constitution and general laws of this State."

The legislation to effectuate this provision of the Constitution is 1 Comp. Laws 1915, § 3304 *et seq.* By section 3306 compulsory provisions of the charter are provided for. By section 3307 permissive provisions are provided for including:

"(*t*) For the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns subject to the Constitution and general laws of this State."

The police power rests in the State. Neither the general language of subdivision (*t*) above quoted nor any other provision of the home-rule act delegates to municipalities the general exercise of all of such police power. Nor do the constitutional provisions above quoted work such result. While the municipality in the performance of certain of its functions acts as agent of the State it may not as such agent fix for the State its public policy. That power has not been delegated to these agents of the State. Unless delegated in some effective way the police power remains in the State. This is settled by the recent case of *City of Kalamazoo* v. *Titus*, 208 Mich. 252. The compulsory rate-making power rests in the State. In that case the city purporting to act under the home-rule statute had fixed a compulsory legislative rate for a public utility. In the course of an opinion holding such action *ultra vires* it was said:

"The charter provision, the ordinance, the argument made for the city, indeed, the suit itself, reflect a popular interest in, and, we conceive, a popular mis-understanding about the subject of home rule, so-called, in cities.   There is apparent a widely spread notion that lately, in some way, cities have become possessed of greatly enlarged powers, the right to exercise which may come from mere assertion of their existence and the purpose to exercise them.   Whether these powers are really inherent in the community, but their exercise formerly was restrained, or are derived from a new grant of power by the State, or may be properly ascribed to both inherent right and to a new grant, are questions which do not seem to bother very much the advocates of the doctrine that they in any event exist.   On the other hand, there is expression of grave doubt whether, in the view of the law, there has been any enlargement or extension of the subjects of municipal legislation and control or of the powers of cities except as those subjects and powers are specifically enumerated and designated in the Constitution itself and in the home rule act.

"Political experiment has not yet produced, in this State, the autonomous city,—a little State within the State.   We have a system of State government and the right of local self-government is, and always has been, a part of the system.   We have, as we have always had, a State Constitution, the fundamental law.   By it, now, as formerly, the legislative power of the State, and all of it, is reposed for exercise in a legislature; save only as reserved by referendum and initiative proceedings, which are not here involved."

And in *Clements* v. *McCabe*, 210 Mich. 207, it was said:

"We may admit that the legal incorporation and organization of a city for local governmental purposes necessarily invests it with certain primary police powers within the conceded sphere of such power fundamentally essential to the ends for which it was created.   But beyond the comparatively narrow limits of such necessary implication the police power, like any other power conferred on a municipality, must be

expressly delegated by the Constitution or legislature of the State.  *  *  *

"In support of the contention that the police power invoked was directly delegated to cities by the Constitution, counsel point to the provision in section 21 of article 8 authorizing a city to pass all laws and ordinances 'relating to its municipal concerns,' and assert, truthfully, that these words are 'very broad.' They are also very general and indefinite words which cannot fairly be construed to plainly designate in concrete terms, or even suggest, a direct constitutional grant of power to cities of such unusual scope and far-reaching possibilities as the yet in many respects debatable police power sought to be exercised in the proposed zoning plan.  *  *  *

"Neither is this unusual and yet debatable police power claimed specifically designated in the so-called 'home-rule' act itself, passed in compliance with the constitutional mandate (Act No. 279, Pub. Acts 1909), as originally enacted or subsequently amended, and what has been said of the necessity that such power must be expressly granted is equally applicable to constitutional provision or legislative enactment and need not be repeated."

In *Coleman* v. *LaGrande*, 73 Or. 521 (144 Pac. 468), it was said:

"By granting and reserving to the people of municipalities the power to enact and amend their charters and adopt local or special laws, the State has not surrendered her sovereignty to the municipalities. Within their boundaries cities are clothed with power to regulate matters purely local. However, a city is not constituted as a sovereignty as regards all matters of legislation, but is still to a certain extent a mere agency of the State of which it is a part. Beyond such municipal boundaries and in matters of general concern not pertaining solely to local municipal affairs, cities are amenable to the general laws of the State which do not infringe upon the right of cities to local self-government. This is so whether such laws are enacted by the legislature or by the people of the State at large."

In the provisions under consideration the city has

undertaken to exercise the police power not only over matters of municipal concern but also over matters of State concern; it has undertaken not only to fix a public policy for its activities which are purely local but also for its activities as an arm of the State. The provisions apply alike to local activities and State activities. If we assume, as we have for the purposes of the case, without deciding the question, that the city possesses such of the police power of the State as may be necessary to permit it to legislate upon matters of municipal concern, it does not follow that it possesses all the police power of the sovereign so as to enable it to legislate generally in fixing a public policy in matters of State concern. This power has not been given it either by the Constitution or the home-rule act. The converse of the situation here presented was before this court in *Davidson* v. *Hine,* 151 Mich. 294 (15 L. R. A. [N. S.] 575, 14 Ann. Cas. 352, 123 Am. St. Rep. 267). There the State had assumed to act in a matter of local self-government as well as a matter of State concern. It was there said by Mr. Justice CARPENTER speaking for the majority of the court:

"If this act had been confined to the police department it would have been constitutional under the decision of *People* v. *Mahaney,* 13 Mich. 481. But it is not so confined. It gives to the bureau appointed by the governor full power and control over the fire department of said city, and it is clear that this feature is an essential part of the act, and, if unconstitutional, the entire act must fall."

We are persuaded here as there that the entire provision under consideration must fall.

The decree will be affirmed, but as the case involves public questions no costs will be allowed.

WIEST, C. J., and McDONALD, CLARK, BIRD, SHARPE, MOORE, and STEERE, JJ., concurred.