SABAUGH *v.* CITY OF DEARBORN

Opinion of the Court

1. Constitutional Law—Municipal Corporations—Public Housing—Public Health.

Public housing is a work involving the public health or safety within the meaning of the constitutional provision allowing cities to acquire, own, establish, and maintain certain properties and facilities including "all works which involve the public health or safety" (Const 1963, art 7, § 23).

2. Municipal Corporations—Powers—Revenue Bond Act.

Municipal corporations may exercise the powers granted them by the Revenue Bond Act of 1933 notwithstanding that no bonds are issued under the act in connection with the exercise of the power (MCLA § 141.104).

3. Municipal Corporations—Powers—Public Housing—Revenue Bond Act.

Acquiring and maintaining public housing for senior citizens is a public work authorized by the section of the Revenue Bond Act of 1933 allowing cities to acquire public improvements including housing facilities (MCLA § 141.103).

---

References for Points in Headnotes

[1-4, 7-17, 20-28] 40 Am Jur 2d, Housing Laws and Urban Redevelopment §§ 2, 3, 9-34.
[1, 7, 10, 11] 39 Am Jur 2d, Health § 5.
[1-28] Constitutionality, construction, and application of statutes or governmental housing projects for improvement of housing conditions. 172 ALR 966.
[2, 13] 38 Am Jur, Municipal Corporations §§ 111-138.
[5-7] 40 Am Jur 2d, Housing Laws and Urban Redevelopment §§ 3, 4, 22.
[8, 15] 43 Am Jur, Public Securities and Obligations §§ 52-70.
[12, 26] 38 Am Jur, Municipal Corporations §§ 102-110.
[14] 38 Am Jur, Municipal Corporations §§ 707, 708.
[18, 19, 21-23] 38 Am Jur, Municipal Corporations § 16.
[18] 49 Am Jur, States §§ 8, 108.

4. MUNICIPAL CORPORATIONS—POWERS—PUBLIC IMPROVEMENTS—COR-
PORATE LIMITS.

> The Michigan Constitution and the Revenue Bond Act section
> implementing it authorizes a city to acquire public works with-
> in or without its corporate limits (Const 1963, art 6, § 23;
> MCLA § 141.104).

5. CONSTITUTIONAL LAW—MUNICIPAL CORPORATIONS—PUBLIC WORKS
—TERRITORIAL LIMITATIONS.

> The constitutional and statutory provisions granting cities the
> power to acquire public improvements within or without the
> corporate limits was not intended to confine the scope of the
> power to places within the state (Const 1963, art 7, § 23;
> MCLA § 141.104).

6. CONSTITUTIONAL LAW—STATES—PUBLIC WORKS—TERRITORIAL LIM-
ITATIONS—FEDERAL QUESTION.

> Ownership of land in one state by another state has been recog-
> nized by the Supreme Court of the United States and presents
> no Federal constitutional question.

### DISSENTING OPINION

T. M. KAVANAGH, C. J., and ADAMS and T. G. KAVANAGH, JJ.

7. CONSTITUTIONAL LAW—MUNICIPAL CORPORATIONS—PUBLIC HOUS-
ING—PUBLIC HEALTH.

> *Public housing involves public health and safety and is not to be*
> *excluded from the constitutional provision empowering cities to*
> *acquire and own all works which involve public health or safety*
> *although not expressly enumerated in that provision (Const*
> *1963, art 7, § 23).*

8. MUNICIPAL CORPORATIONS—POWERS—REVENUE BOND ACT.

> *Bonds need not be issued before a city may proceed under the*
> *Revenue Bond Act (MCLA § 141.101 et seq.).*

9. MUNICIPAL CORPORATIONS—REVENUE BOND ACT—PUBLIC HOUSING
—PUBLIC WORKS.

> *The Revenue Bond Act authorizes acquisition of public improve-*
> *ments by cities and defines a public improvement to include*
> *"housing facilities"; consequently, public housing is a public*
> *work with the expenditure therefor being for a public purpose*
> *(MCLA § 141.101 et seq.).*

10. CONSTITUTIONAL LAW—CONSTRUCTION—MUNICIPAL CORPORATIONS
—POWERS—PUBLIC HEALTH OR SAFETY.

> *The Michigan Supreme Court has repeatedly held that the provi-*
> *sions of the Constitution of 1908 authorizing any city or village*

*to acquire, own, establish and maintain either within or without its corporate limits all works which involve the public health or safety were not self-executing and, because substantially the same language has been retained in the Constitution of 1963, the same construction of its provisions would be applicable (Const 1908, art 8, § 22; Const 1963, art 7, § 23).*

11. CONSTITUTIONAL LAW—MUNICIPAL CORPORATIONS—POWERS—PUBLIC HEALTH—CORPORATE LIMIT.

*The constitutional provisions that a city or village may acquire, own, establish and maintain, either within or without its corporate limits all works which involve the public health or safety conferred no new or additional municipal power (Const 1908, art 8, § 22; Const 1963, art 7, § 23).*

12. MUNICIPAL CORPORATIONS—HOME RULE—PUBLIC CHARACTER—PRIVATE CHARACTER—NECESSITIES AND CONVENIENCES.

*Home rule provisions of constitutions and statutes did not materially alter the concept of local government that municipal corporations are of a twofold character, the one public, as regards the state at large, insofar as they are its agents in government, the other private, insofar as they are to provide the local necessities and conveniences for the citizens.*

13. MUNICIPAL CORPORATIONS—POWERS.

*The powers to be exercised by municipal corporations are: (1) those granted by express words, (2) those implied in, or incident to, the powers expressly granted, or (3) such powers as are essential to the declared objects or purposes of the corporation.*

14. MUNICIPAL CORPORATIONS—PRIMARY PURPOSE—INHABITANTS—NONRESIDENTS.

*The primary purpose of a municipal corporation is to contribute toward the welfare, health, happiness and public interest of the inhabitants of such corporation, and not to further the interests of those residing outside its limits.*

15. MUNICIPAL CORPORATIONS—REVENUE BOND ACT—PURPOSE—PUBLIC WORKS.

*The Revenue Bond Act was passed during the great depression and its primary purpose was to provide a means for the construction of public works which, in turn, would provide employment for the unemployed of this state (MCLA § 141.101 et seq.).*

16. MUNICIPAL CORPORATIONS—POWERS—PRIVATE CAPACITY—PUBLIC CAPACITY—REVENUE BOND ACT.

> *The Revenue Bond Act, as its name implies, is an act as an aid to local improvements without the involvement of general fund debt limitations and is not a grant of power to a city to act in a private capacity but rather in a public one (MCLA § 141.101 et seq.).*

17. MUNICIPAL CORPORATIONS—POWERS—REVENUE BOND ACT—PUBLIC IMPROVEMENTS—LOCATION.

> *The grant of power given to cities by the Revenue Bond Act should not be construed so broadly that public improvements, although designed to provide the local necessities and conveniences, could be built by a city anywhere in this state or, for that matter, anywhere in the world (MCLA § 141.101 et seq.).*

18. STATES — JURISDICTION — MUNICIPAL CORPORATIONS — POWERS — TERRITORIAL LIMITS.

> *The state cannot extend its sovereign jurisdiction beyond its territorial limits and what is beyond the power of the state is also beyond the power of one of its municipalities.*

19. MUNICIPAL CORPORATIONS—POWERS—STATE BOUNDARIES.

> *The power of a city, acting in its local capacity or as an agent for the state, cannot extend beyond the boundaries of this state.*

20. MUNICIPAL CORPORATIONS—REVENUE BOND ACT—PRIVATE ENTERPRISE.

> *The broad grant of authority contained in the Revenue Bond Act does not permit a city to engage in private enterprise (MCLA § 141.101 et seq.).*

21. MUNICIPAL CORPORATIONS—MUNICIPAL PURPOSES—BOUNDARIES—HOUSING.

> *Municipalities can acquire lands and property rights beyond their boundaries for legitimate municipal purposes only.*

22. MUNICIPAL CORPORATIONS—BOUNDARIES—HOUSING.

> *Action of a city in attempting to move outside its boundaries to provide housing for its inhabitants can be upheld only under the most extraordinary circumstances.*

23. MUNICIPAL CORPORATIONS—HOUSING—BOUNDARIES—INHABITANTS OF MUNICIPALITY.

> *Housing is unique among the proprietary enterprises a city may engage in; other facilities authorized by the Revenue Bond Act,*

*built outside the municipality, are constructed in whole, or at least in major part, for the city's inhabitants; but, when the city acquires housing outside its boundaries, by the very nature of such an action it divests itself of the right to act for those who occupy the housing, as they are then no longer inhabitants of the city.*

24. STATES—HOUSING.

*The public policy of this state as to housing may be summed up as twofold: (1) to reduce or eliminate slums and blighted areas; (2) to provide housing for certain residents of the state, primarily persons of low or moderate income.*

25. MUNICIPAL CORPORATIONS—PUBLIC POLICY—HOUSING DIRECTOR.

*The purchase by a city in this state of an apartment building in Florida to meet the needs of the elderly of that city is completely beyond the public policy of this state and the attempt to place the management and operation of such a building in the hands of the housing director of that city is an impermissible exercise of governmental power.*

26. MUNICIPAL CORPORATIONS — CITY — PRIMARY PURPOSE — LOCAL NEEDS — HOME RULE — CONSTITUTIONAL LAW — STATUTES.

*The primary purpose of a city is to serve local needs and constitutional and statutory provisions with regard to home rule are intended to allow cities to meet such local needs.*

27. MUNICIPAL CORPORATIONS—HOUSING PROJECT—PUBLIC WORK— PROPRIETARY VENTURE—LOCATION—PUBLIC USE.

*A housing project located in Florida cannot be a public work of a Michigan municipality because it is outside the state and, as a proprietary venture, since it does not serve local needs, it does not meet the test of public use which a city must meet when it ventures into such an activity.*

28. MUNICIPAL CORPORATIONS—PUBLIC HOUSING PROJECT—STATUTES —PUBLIC POLICY.

*A housing project located in Florida and owned by the City of Dearborn is not authorized by legislative enactment or by the public policy of Michigan.*

Appeal from Court of Appeals, Division 1, Lesinski, C. J., and J. H. Gillis and Beer, JJ., affirming Wayne, James N. Canham, J.   Submitted January

13, 1970.   (No. 10, January Term 1971, Docket No. 52,387.)   Decided April 5, 1971.

16 Mich App 182 affirmed.

Complaint by Samuel Sabaugh and Joseph L. Woloszynski, Jr., against the City of Dearborn and certain of its officials, to enjoin purchase and operation by defendants of an apartment building in Florida for the benefit of defendant city's senior citizens, and for other relief.   Defendants' motion for summary judgment granted.   Plaintiffs appealed to Court of Appeals.   Affirmed.   Plaintiffs appeal. Affirmed.

*James Thomson,* for plaintiffs.

*Ralph B. Guy, Jr.,* Special Counsel, *Joseph J. Burtell,* City Attorney, and *Carl P. Garlow,* Assistant City Attorney, for defendants.

PER CURIAM.* The council of defendant City of Dearborn, proceeding under authority of the Revenue Bond Act of 1933, Act No 94, PA 1933, as amended (MCLA § 141.101 *et seq.*; Stat Ann 1969 Rev § 5.2731 *et seq.*), adopted a resolution for submission of a bid to the Federal Housing Administration on an 88-unit apartment in Clearwater, Florida.   The bid was submitted and was successful. Thereafter, under direction of the council, the purchase was consummated and the city became owner of the apartment, intended to be used for rental to senior citizens of defendant city who could not endure the rigors of Michigan winters.

---

\* This Opinion rendered in *Per Curiam* form was originally prepared by Justice JOHN R. DETHMERS prior to his retirement and is adopted verbatim.

Plaintiffs, as taxpayers of the city, brought this action praying that the resolution of the city council be set aside and held illegal, that defendants' purchase of the property be restrained, and for a determination that the action of the city council is illegal, ultra vires, unconstitutional and void.

The trial court granted defendants' motion for accelerated or summary judgment dismissing plaintiffs' complaint. The Court of Appeals affirmed, holding that defendant city has the power to establish, own and operate public housing facilities outside this state. The matter is here on leave granted to plaintiffs to appeal.

Plaintiffs state the question involved in this appeal as follows:

"Can the defendant purchase, own and operate with tax funds an 88-unit apartment building in the State of Florida?"

Plaintiffs appear to advance as reasons for answering in the negative the following:

1. The grant of power to cities in the Michigan Constitution of 1963, art 7, § 23, to acquire, own, establish and maintain certain properties and facilities therein specified does not include in the list public housing. The answer to that is that it does expressly include "all works which involve the public health or safety". In *Advisory Opinion re Constitutionality of PA 1966, No 346* (1968), 380 Mich 554, we held that the construction of housing is an enterprise affected with a public interest. In *Thomson* v. *City of Dearborn* (1957), 348 Mich 300, where counsel for plaintiffs here was the plaintiff, he urged this same argument against this same city's acquisition of off-street parking facilities. This Court upheld the right of the city to do so, stating that it was a work involving public health

or safety. Public housing is no less so. *Thomson v. City of Dearborn* (1960), 362 Mich 1, tends to support this view. It is to be noted, also, that Michigan Constitution of 1963, art 7, § 22, provides:

"No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section."

This indicates that the grant of itemized powers contained in the subsequent § 23 is not to be deemed exclusive.

2. Plaintiffs say that the Revenue Bond Act of 1933, Act No 94, under which the city has presumed to act, is not applicable here because no bonds were involved in the transaction. This overlooks § 4 of the act, MCLA § 141.104 (Stat Ann 1969 Rev § 5.2734), which reads:

"The powers in this act granted may be exercised notwithstanding that no bonds are issued hereunder."

We are satisfied that the acquiring and maintaining of public housing for senior citizens of the city is a public work, involving public health, within the competence of the city. The Revenue Bond Act of 1933, authorizing acquisition of public improvements by cities, defines public improvements, in § 3 of the act, as including, at the head of the list, "housing facilities". Accordingly, public housing should be considered no less a public work, with expenditures therefor being for a public purpose, than we held a marina to be in *Gregory Marina, Inc.,* v. *City of Detroit* (1966), 378 Mich 364.

Section 4 of the Revenue Bond Act authorizes the acquisition and operation of "public improvements * * * within or without its corporate limits." This implements the provisions of Michi-

gan Constitution of 1963, art 7, § 23, authorizing
a city to acquire public works "within or without
its corporate limits." There can be no doubt, then,
that a city may do that which defendant city has
done here if on a location without its corporate
limits but within the State of Michigan.

Was it the intent of the framers of the Michigan
Constitution and of the electors in the adoption
thereof, and of the legislature, that the noted lan-
guage "within or without" in the Constitution and
the statute might include places outside of this
state? If such was the intent, would that be viola-
tive of the Constitution of the United States?

Nothing in the language of the Michigan Constitu-
tion or in the Revenue Bond Act granting the power
in question to cities expresses an intent to limit the
meaning of the term "within or without its corporate
limits" so as to confine its scope to places within
this state. We hold that such was not the intent.
In 1968, House Bill No. 3595 was introduced in the
legislature which proposed to amend the Revenue
Bond Act to provide that no out-of-state acquisitions
were permissible thereunder. The bill did not pass.

Plaintiffs cite no authority for the proposition
that the conferring by the Michigan Constitution
or statute upon its cities of authority to acquire and
operate public works in another state would be un-
constitutional under the Constitutions of this state
or of the United States and we find none.

As for the provision of Michigan Constitution of
1963, art 7, § 23, authorizing city acquisition of
public works "within or without its corporate limits"
and the like provision in § 4 of the Revenue Bond
Act, a similar provision in a Tennessee statute
(Williams Ann Code, § 2726.13) was construed in
*McLaughlin* v. *City of Chattanooga* (1944), 180 Tenn
638 (177 SW2d 823), to mean that the City of

Chattanooga had power to expend public funds in the purchase of lands for municipal airport purposes located outside of its corporate limits, lying partly in the State of Tennessee and extending over into the State of Georgia. The court observed that the words "within and without" embraced every place in the universe, including locations outside of the state. The Tennessee court went on to say:

"For more than one hundred years the State of Georgia has owned valuable property in Tennessee, located within the City of Chattanooga, with clearly implied, if not expressed, legislative, municipal and judicial recognition by this State, the City of Chattanooga, and the Courts. Twenty years ago the Supreme Court of the United States clearly recognized the right of ownership by Georgia of property in Tennessee. *State of Georgia* v. *City of Chattanooga* [1924], 264 US 472, 480, 481, 44 S Ct 369, 370, 68 L Ed 796, 799."

An examination of the opinion in *State of Georgia* v. *City of Chattanooga* (1924), 264 US 472 (44 S Ct 369, 68 L Ed 796), discloses a situation in which the State of Georgia owned property in Chattanooga, Tennessee, which the latter was seeking to condemn in part for street purposes. The United States Supreme Court held that Georgia's ownership of land in Tennessee was not in a sovereign capacity but a proprietary one, and, hence, the property was subject to condemnation by the city. The court took the right of Georgia to own property in its proprietary capacity in the State of Tennessee as a matter of course, with no suggestion of involvement of a Federal constitutional question in that regard. Had the court considered that there was such a question, this would have been the occasion to consider and decide it. Not having done so, we think it follows that no such question exists.

Affirmed. No costs, a public question being involved.

Black, T. E. Brennan, Swainson and Williams, JJ., concurred.

Adams, J. (*dissenting*). Sunday, November 12, 1967, the council for the City of Dearborn at a special meeting, acting on the recommendation of the Dearborn Housing Commission, authorized a bid for the purchase of an 88-unit apartment, "Clearview Towers," in Clearwater, Florida. On November 21, 1967, at a regular meeting, the council ratified and readopted such action. On December 4, 1967, it authorized the purchase of the property for $1,076,111. Funds for the purchase of Clearview Towers were obtained by loans of $270,000 from a camp concession fund and $670,000 from a recreation camp improvement fund. The resolution authorizing the purchase does not indicate where the balance of the purchase price would come from. Authority for this action is stated in the council's resolution to be PA 1933, No 94, the Revenue Bond Act of 1933, as amended (MCLA § 141-.101 *et seq.* [Stat Ann 1969 Rev § 5.2731 *et seq.*]).

The council placed the general care and management of the project under the city's Housing Director. That office had been created by ordinance pursuant to PA 1933 (Ex Sess), No 18, as amended (CL 1948, § 125.651 *et seq.* [Stat Ann § 5.3011 *et seq.*]), the Municipal Housing Act.[1] The apartment

---

[1] Section 5 of the act authorizes a housing commission operating under the act to appoint a director. Section 7 of the act provides that the commission shall have certain powers and duties. Subsection (a) is particularly pertinent here:

"(a) To determine in what *areas of the city* or village it is necessary to provide proper sanitary housing facilities for families of low income and for the elimination of housing conditions which are detrimental to the public peace, health, safety, morals and/or welfare; * * * ." (Emphasis supplied.)

building has been operating as a rental housing
project since the purchase by the City of Dearborn.
No details of the operation, management or alloca-
tion of units to the elderly are contained in the
record.

The city's brief states: "Adequate housing for
the elderly has been an active concern of the City
of Dearborn since 1959." A 79-unit high rise apart-
ment was built with federal assistance in 1963. A
119-unit was opened in 1968 and a 135-unit was
undertaken for occupancy in January, 1970.

In its statement of facts, the city's brief sets forth
the following justification for the Florida purchase:

"In the course of the City's extensive dealings
and experience with the elderly, one of the facts
that was learned was that many, as they grow older,
can no longer withstand the rigors of the Michigan
winters. Because of this, *many of our senior citi-
zens have migrated to Florida and other warmer
areas.* In addition, however, a less obvious but
equally important fact was also learned. Many of
our elderly who have gone to places such as Florida
have enjoyed the climate but have missed their com-
munity and their ties with friends and relatives
back home. Because of this factor, the City has for
some time considered acquiring property in Florida
which would provide not only housing facilities, but
the sense of community which is lacking when one
goes there alone." (Emphasis added.)

This is the extent of the volunteered facts which
we have before us on this skimpy record.

The 1960 census figure for the population of Dear-
born is 112,007.

The trial court found that the city was acting
pursuant to a statutory grant of power given to
cities to acquire housing facilities by the provisions

of the Revenue Bond Act and granted defendant's motion for summary judgment.

The Court of Appeals held that the Constitution, as implemented by the Revenue Bond Act, expressly allows a municipal corporation to acquire public works involving public health or safety outside of the city's corporate limits. "[T]he fact that the acquisition occurs outside of Michigan as well as being outside the corporate limits does not destroy its legality." 16 Mich App 182, at 185. The Court said the City of Dearborn had the *power* to establish public housing outside the state. 16 Mich App at 186. I believe this shows the Court of Appeals considered the question as one involving "public health or safety" and that performance was an exercise of the police power. If it was a governmental function, it cannot be extended beyond the borders of this state.

Justice DETHMERS writes:

(a) The Constitution of 1963, art 7, § 23, empowers cities to acquire, own, etc., "all works which involve the public health or safety." Public housing involves public health and safety and is not to be excluded although not expressly enumerated in this section. I agree.

(b) It is not necessary that bonds be issued before a city may proceed under the Revenue Bond Act. I agree.

(c) The Revenue Bond Act authorizes acquisition of public improvements by cities, defines a public improvement to include "housing facilities"; consequently, *public* housing is a *public* work with the expenditure therefor being for a public purpose. I agree.

(d) Without doubt the City of Dearborn could have taken action to acquire this type of housing

facility within the State of Michigan although located outside its corporate limits. Query?

(e) There is no Federal constitutional issue involved in a state acquiring property outside its borders. In doing so, it acts in a proprietary capacity and not as a sovereign. Since we have no Federal question in this case, I decline to comment.

## I. THE CONSTITUTION AND HOME RULE

*(a) Article 7, Constitution of 1963.*

Article 7 is the Local Government article of the Constitution of 1963. Article 8 is the comparable article of the Constitution of 1908. The following explanation of the Home Rule sections of Article 8 was given in the Address to the People submitted at the time of the vote on the Constitution of 1908:

"The foregoing provisions for the government of cities and villages have no corresponding provisions in the present constitution. They supersede Sec. 38, Art. IV, and Secs. 13 and 14, Art. XV, so far as said sections relate to cities and villages.

"The provisions herein contained are designed to meet the modern conditions affecting municipal affairs; to authorize through appropriate legislation that which has heretofore been denominated 'Home Rule.'

"These provisions constitute a marked advance from the present constitutional provisions relating to cities and villages by doing away with the principle of classification and with special charters, granted and subject to amendment only by the state legislature. The purpose is to invest the legislature with power to enact into law such broad general principles relative to organization and administration as are or may be common to all cities and all villages, each city being left to frame, adopt, and amend those charter provisions which have reference to their local concerns. *The most prominent*

*reasons offered for this change are that each munic-
ipality is the best judge of its local needs and the
best able to provide for its local necessities;* that
inasmuch as special charters and their amendments
are now of local origin, the state legislature will
become much more efficient and its terms much
shorter if the labor of passing upon the great mass
of detail incident to municipal affairs is taken from
that body and given into the hands of the people
primarily interested.[2]

"Under these provisions, cities and villages, as
under the present Constitution, will remain subject
to the constitution and all the general laws of the
state." (Emphasis added.)

*(b) Significance of "Within or Without."*

Section 23 of art 7 of the Constitution of 1963
reads:

"Any city or village may acquire, own, establish
and maintain, *within or without* its corporate limits,
parks, boulevards, cemeteries, hospitals and all
works which involve the public health or safety."
(Emphasis added.)

The comparable Local Government provision of
the Constitution of 1908, art 8, § 22, reads as follows:

"Any city or village may acquire, own, establish
and maintain, either *within or without* its corporate
limits, parks, boulevards, cemeteries, hospitals,
almshouses and all works which involve the public
health or safety." (Emphasis added.)

---

[2] "Prior to the adoption of the new Constitution in 1908, every
city charter was the result of express legislative provision. The
charters of all fourth class cities were identical, the form being
provided by an act of the legislature in 1895, but each of the larger
cities had its own special charter, passed in its entirety by the legis-
lature. * * * Every session of the legislature saw the passage
of a large number of amendments to such charters. The local acts
of each session regularly filled a volume of some nine or ten hundred
pages, containing mostly charter revisions or amendments and special
acts for cities, villages and other local governmental units." Jacobson,
*Charter Amending Powers of Cities Under Michigan Home-Rule Legis-
lation,* 14 Mich L Rev 281 *et seq.* (1916).

The Constitutions of 1850 and 1835 contain no such provision.

Permission to "acquire, own, establish and maintain, either *within or without its corporate limits*" (emphasis supplied) when originally adopted, was intended to be a clarification of already recognized and exercised municipal authority.

Prior to the Constitutional Convention of 1907, this Court had decided that where a city charter contained general authority over drainage but no express authority to execute drainage works beyond the city limits, the city could contract for the widening of an existing drainage ditch outside the city limits so as to afford an adequate outlet to the city's drainage system. *City of Coldwater* v. *Tucker* (1877), 36 Mich 474. In that case the Court expressed concern over ownership of property beyond city limits—whether the exercise of governmental functions was circumscribed by municipal boundaries. The Court said (pp 477, 478):

"The general doctrine is clear that a municipal corporation cannot usually exercise its powers beyond its own limits. If it has in any case authority to do so, the authority must be derived from some statute which expressly or impliedly permits it. There are cases where considerations of public policy have induced the legislature to grant such power. The commonest instances are, where a supply of water can only be obtained from a distance. Where the city erects its own works or lays its own pipes for such a purpose, it has usually been found necessary, in order to furnish adequate safeguards for the preservation of the property, to pass special statutes to cover the case. There would be serious difficulties attending the management of expensive public works situated in one town or city, and owned by another, unless expressly provided for. If a city cannot regulate and protect its public works against

injuries and interference, they are liable to serious dangers. * * * In the absence of any sufficient legislation to overcome the difficulty, the power to make provision for outside work, if existing at all, can only be exercised by resorting to contracts to obtain rights and privileges which, within the city, can generally be secured, if necessary, by proceedings *in invitum*. It would still be an important question, whether, even by contract, a city can build or possess public works beyond its limits, without plain permission."[3]

Mr. Milnes, Chairman of the Committee on Cities and Villages, stated to the Constitutional Convention the reason for § 22, art 8 of the Constitution of 1908 as follows:

"Now the next provision that we make is that cities and villages may acquire, own, establish and maintain, either within or without their corporate limits, water works, cemeteries, hospitals, almshouses, and all works which involve the public health or safety. We have believed that this provision should go into the Constitution. It is quite necessary at times that cities and villages go outside of their own corporate limits for the purpose of obtaining a supply of pure water for the use of their inhabitants, and it strikes me that there can be no particular objection to this phase of it. The same with hospitals. We certainly have to go outside; we have gone outside of our own city for a pest house, a hospital of that kind, and I think there are many other cities and villages in the state that would like

---

[3] See also, *Attorney General* v. *Burrell* (1875), 31 Mich 25, for discussion of the power of a township to own a park within the limits of a village. The power was upheld, Justice Christiancy stating:

"Certainly lands for a common or park are for the 'public use of the inhabitants.'" (P 31.)

Justice Cooley stated:

"The power to purchase and hold lands 'for the public use of the inhabitants,' is expressly conferred * * * ." (P 33.)

that same privilege given to them." (Vol 2, Con Con 1907–08, p 807).

Art 8, § 22 of the Constitution of 1908 conferred no new powers on municipal corporations. After its adoption, the Court upheld the exercise of extra-territorial power on the basis of local necessities and conveniences without reliance on the "within or without" language contained in the Constitution. In *City of Pontiac* v. *Ducharme* (1936), 278 Mich 474, a contract to purchase a sewage disposal site outside the city was held not to be *ultra vires*. In *Village of St. Clair Shores* v. *Village of Grosse Pointe Woods* (1947), 319 Mich 372, plaintiff sought to enjoin defendant from owning and maintaining a park within plaintiff's boundaries. The Court held (p 380):

"[D]efendant  *  *  *  is a  *  *  *  landlocked village, whereas plaintiff village has an extensive shore line  *  *  *  ; hence it seems quite 'necessary or expedient for the interest of its inhabitants' that defendant village should acquire and maintain this park area which borders on Lake St. Clair."

In *City of Detroit* v. *Oakland County* (1958), 353 Mich 609, a golf course, zoo and parking lot owned by Detroit and located in Oakland County were found to be used for public or governmental purposes.

Municipal power to acquire property is set forth in 63 CJS, Municipal Corporations, § 958, p 507, as follows:

"A municipal corporation may at common law, and generally by express charter or statutory provision, purchase or otherwise acquire and hold all such property, real and personal, as may be necessary to the proper exercise of any power specifically conferred or essential to those purposes of municipal

government for which it was created, even though it has no immediate need therefor, and, having purchased property for municipal purposes, a municipality may hold it after it is no longer necessary for such purposes."

This Court repeatedly held that the provisions of art 8, § 22 of the Constitution of 1908 were not self-executing. See, *City of Detroit* v. *Oakland Circuit Judge* (1927), 237 Mich 446; *Sault Ste. Marie City Commission* v. *Sault Ste. Marie City Attorney* (1946), 313 Mich 644, 657; *Wayne Village President* v. *Wayne Village Clerk* (1949), 323 Mich 592; *Thomson* v. *City of Dearborn* (1957), 348 Mich 300, 304. Because substantially the same language has been retained in the Constitution of 1963, art 7, § 23, the same construction of its provisions would be applicable. Consequently, the 1908 and 1963 constitutional language "within or without" conferred no new or additional municipal power.

## II. EXTENT OF MUNICIPAL POWER

(a) *Dual Nature of Municipal Government.*

In 1895 in *Davock* v. *Moore,* 105 Mich 120, Justice LONG described the nature of local governments as follows (p 128):

"Municipal corporations are of a two-fold character,—the one public, as regards the State at large, in so far as they are its agents in government; the other private, in so far as they are *to provide the local necessities and conveniences* for the citizens." (Emphasis added.)

This concept of local government was not materially altered under Home Rule. See, *Pryzbylowski* v. *Board of Commissioners of the Poor of the City of Detroit* (1915), 188 Mich 270; *Attorney General, ex rel. Lennane,* v. *City of Detroit* (1923), 225 Mich 631;

and *Curry* v. *Highland Park* (1928), 242 Mich 614, for recognition by the Court of the dual role or function of cities.

*(b) Sources of Municipal Power.*

Turning next to the authority of municipal corporations, Justice CHRISTIANCY, writing in 1875 in the case of *Attorney General* v. *Burrell,* 31 Mich 25, said the powers to be exercised are (1) those granted by express words, (2) those implied in, or incident to, the powers expressly granted, or (3) such powers as are essential to the declared objects or purposes of the corporation. This pronouncement has been reiterated and applied as a restraint upon municipal action in the following cases: *Attorney General* v. *Common Council of the City of Detroit* (1907), 150 Mich 310; *Barnhart* v. *Grand Rapids* (1926), 237 Mich 90; *Toebe* v. *City of Munising* (1937), 282 Mich 1; *City of Detroit* v. *Michigan Public Utilities Commission* (1939), 288 Mich 267; and *Home Owners' Loan Corp.* v. *City of Detroit* (1940), 292 Mich 511.

The nature and extent of territorial municipal power is analyzed in 37 Am Jur, Municipal Corporations, § 122, pp 736, 737, as follows:

"*The primary purpose of a municipal corporation is to contribute toward the welfare, health, happiness, and public interest of the inhabitants of such corporation, and not to further the interests of those residing outside its limits;* therefore, the general rule is that municipal corporations have no extraterritorial powers, but their jurisdiction ends at the municipal boundaries and cannot, without specific legislative authority, extend beyond their geographical limits. The legislature may, however, confer jurisdiction upon municipal corporations for sanitary and police purposes, and for license regulation under the police power, over territory contiguous

to the corporation. As a governmental unit, the municipal corporation is the agent of the state, exercising its powers for and in behalf of the state, and the courts are inclined to be liberal in upholding legislation extending governmental powers in proper cases beyond the municipal limits. Furthermore, the practical necessities of municipal administration have compelled the courts to recognize that a municipality cannot be a self-contained unit, but must be permitted to go beyond its boundaries, so that the rule has been announced that when a power granted to a municipal corporation cannot be exercised without going outside the corporate limits, the requisite authority to do so will be implied. Thus, a municipal corporation may, when necessary or manifestly desirable, acquire land and make contracts to construct works beyond its corporate limits for the discharge of sewage and drainage, since drainage, whether of surface water or of impurities, can seldom be effectual unless removed beyond the inhabited limits. In some jurisdictions, statutory enactments specifically empower municipal corporations to extend public improvements, such as sewers, beyond the corporate limits, where necessary to carry out the scope and object of the improvement. Frequently, a municipality must go outside its limits for a water supply, and when that is the case, the right to do so will be implied; legislatures of some states have authorized municipal corporations in such cases to exercise police jurisdiction to prevent pollution or destruction of waterworks property. There is some authority for the proposition that while a municipal corporation cannot exercise governmental authority outside its territorial limits, in the exercise of its business functions it may purchase land wherever it is most convenient, and may exercise the ordinary rights of ownership over land so purchased. A municipal corporation, however, cannot be authorized by the legislature of a state other than that which created it to acquire property

for governmental purposes situated in such other state. Nevertheless, there can be no doubt of the power of the legislature to authorize a municipal corporation to acquire the ownership of property outside its territorial limits." (Footnotes omitted and emphasis added.)

The City of Dearborn purports to find the necessary power in the provisions of PA 1933, No 94, being the Revenue Bond Act of 1933, as amended. Under Justice CHRISTIANCY's classification, this would be a power granted by express words. The act was given immediate effect to "secure the public health, safety, convenience and welfare" of various governmental instrumentalities of the State of Michigan. It was passed during the great depression and its primary purpose was to provide a means for the construction of public works which, in turn, would provide employment for the unemployed of this state. The act, as its name implies, is a revenue bond act as an aid to local improvements without the involvement of general fund debt limitations. The act is not a grant of power to a city to act in a private capacity but rather in a public one.

Section 3 of the act—Definitions—defines as public improvements: housing facilities, garbage and rubbish disposal plants, incinerators, transportation systems, sewage disposal systems, water supply systems, electric and gas utility systems, automobile parking facilities, yacht basins, harbors, docks, wharves, terminal facilities, elevated highways, bridges, tunnels, ferries, community buildings, markets, stadiums, convention halls, auditoriums, dormitories, hospitals, parks, recreational and aeronautical facilities, marine railways, and buildings devoted to public use. Following the reasoning of Justice DETHMERS, any and all of these facilities could be built by a city anywhere in the State of Michigan

or, for that matter, anywhere in the world. I do not construe the grant of power given to cities by the Revenue Bond Act that broadly. It should be noted that all of these facilities are designed or can be used "to provide the local necessities and conveniences" of which Justice LONG wrote in *Davock, supra.* Even if it should be contended that any of these facilities may be constructed by a city acting in its role of agent for the state, the facilities are still intended to serve the public health, safety, convenience and welfare of the people of the State of Michigan.

The state cannot extend its sovereign jurisdiction beyond its territorial limits. 81 CJS, States, § 3. What is beyond the power of the state is also beyond the power of one of its municipalities. If the purpose of Dearborn, acting beyond its boundaries, is to provide public housing for the elderly, such action would be an exercise of the police power and the performance of a governmental function. The city's power, acting in its local capacity or as an agent for the state, could not extend beyond the boundaries of this state.

Justice DETHMERS would uphold the city's action by concluding that in making the purchase, the city acted in a proprietary capacity and not in a sovereign or governmental one. What is the limit of its power to proceed in a proprietary capacity?

Prior to the adoption of the Constitution of 1908, the question arose as to the validity of legislation authorizing municipal ownership and operation of plants and facilities which would permit municipalities to engage in business as a service to their citizens where such an undertaking might be in competition with private business. Common examples were water, light, heat, and transportation.

In *Mitchell* v. *City of Negaunee* (1897), 113 Mich 359, the issue was the legality of statutes authorizing municipal light plants. The Court said (p 364):

"These provisions will stand if furnishing electric lights is a public service."

In upholding the validity of the statutes, the Court concluded that the furnishing of electric light and water is a public service and that the performance of such service can be delegated by the legislature to cities and towns for their own benefit and the benefit of their inhabitants.

In *Wood* v. *City of Detroit* (1915), 188 Mich 547, an award of compensation for the death of an employee of the Public Lighting Commission was upheld against the claim that it was beyond the power of the legislature to bring municipal corporations within the provisions of the workmen's compensation act. The Court said (p 559):

"[The new Constitution] has not abolished all distinctions between municipal and other corporations and individuals with respect to the exercise of the powers conferred nor denied the power of the legislature to enact general laws applicable to cities. *The distinction between powers governmental in character and those private in character, as exercised by municipal corporations, does not involve the abrogation of the distinction between private municipal activity and private individual activity. To employ a seeming paradox, private municipal activities are all of them public. What has been called private in municipal activity is, nevertheless, public when contrasted with purely private enterprise and adventure.*" (Emphasis added.)

*Traverse City* v. *Blair Twp.* (1916), 190 Mich 313, involved the liability of the city for taxes on its power plant located outside the boundaries of

the city. In reviewing the issue, the Court pointed out (pp 317, 318):

"While in distinguishing the purely governmental powers of a municipality from its authorized business activities in supplying itself and its inhabitants with a certain class of utilities and conveniences for which in places of concentrated population there is a general need, and which it is recognized under present conditions of civilization public welfare demands, the latter are sometimes referred to as private business enterprises, perhaps because such wants may be and sometimes are supplied for profit by private parties; yet in the final analysis they are in no true sense private business or private property when operated and owned for public benefit by a municipality under constitutional or statutory authority."

See also cases cited under II(b) for limitation of municipal power.

Not every housing project, even for the elderly, is a public work. In the case of *Hays* v. *Kalamazoo* (1947), 316 Mich 443, 454, this Court quoted with approval a passage from 37 Am Jur, Municipal Corporations § 120, p 735, which has been much quoted as to the meaning of "public purpose." The last two sentences of the passage read as follows:

"The test of public use is not based upon the function or capacity in which or by which the use is furnished. *The right of the public to receive and enjoy the benefit of the use determines whether the use is public or private.*" (Emphasis added.)

The broad grant of authority contained in the Revenue Bond Act does not permit a city to engage in private enterprise. Municipalities can acquire lands and property rights beyond their boundaries for legitimate municipal purposes only. When a city attempts to move outside its boundaries to pro-

vide *housing* for its inhabitants, such action can be upheld only under the most extraordinary circumstances. Housing is unique among the proprietary enterprises a city may engage in. In the case of light, water, sewer plants, or the other facilities authorized by the Revenue Bond Act, when the facility is built outside the municipality it is nevertheless constructed in whole, or at least in major part, for the benefit of the inhabitants of the city. Only when a city acquires housing outside its boundaries, by the very nature of such an action does it divest itself of the right to act for those who occupy the housing since they are then no longer inhabitants of the city.[4]

In this case, the city states in its brief that "many of our senior citizens have migrated to Florida and other warmer areas." The power of a city to serve local needs does not extend to serving those who have migrated to Florida, the South Seas, Shangrila or Timbuktu.[5] Dearborn citizens who have

---

[4] In *Detroit* v. *Wayne Circuit Judges* (1954), 339 Mich 62, after quoting from the Revenue Bond Act, the Court said (p 70): "In authorizing parking 'without the corporate limits,' it contemplates off-street parking. A municipality does not have city streets outside the corporate limits."

[5] See Industrial Development Revenue Bond Act of 1963, PA 1963, No 62, as amended, being MCLA § 125.1251 *et seq.* (Stat Ann 1969 Rev § 5.3533[21] *et seq.*).

The constitutionality of the act was upheld in *City of Gaylord* v. *Gaylord City Clerk* (1966), 378 Mich 273.

See particularly § 125.1266 which provides in part:

"The various powers conferred herein may be exercised independently and notwithstanding that no bonds are issued hereunder."

This section was added by PA 1966, No 340, effective September 21, 1966.

Section 125.1253 authorizes "within or without."

The act defines "industrial building" as "any building or structure, etc." and defines "industrial machinery and equipment" as "such machinery and equipment, etc." § 125.1252.

Query: Since the Industrial Bond Act is patterned after the Revenue Bond Act and uses the same language and contains many of the same provisions, does this mean a municipality can construct industrial plants and buy industrial machinery anywhere in the world for rental purposes?

migrated should look to their new communities for housing, if there is a public need for such, rather than for Dearborn to undertake such a worldwide mission.

The public policy of this state with regard to public housing can be determined from the various laws dealing with housing. All of these statutes clearly pertain to housing within the State of Michigan:

PA 1917, No 167 (MCLA § 125.401 *et seq.;* Stat Ann 1969 Rev § 5.2771 *et seq.*), is a general housing law.

PA 1933, Ex Sess, No 18 (MCLA § 125.651 *et seq.;* Stat Ann 1969 Rev § 5.3011 *et seq.*), pertains to municipal housing facilities and permits cities to acquire housing "to eliminate housing conditions which are detrimental to the public peace, health, safety, morals or welfare."

PA 1941, No 268 (MCLA § 125.711 *et seq.;* Stat Ann 1969 Rev § 5.3059[1] *et seq.*), pertains to defense housing facilities, recognizes a housing shortage in the state, and allows cities to act "to assure the availability when needed of safe and sanitary dwellings for persons engaged in national defense activities."

PA 1937, No 293 (MCLA § 125.601 *et seq.;* Stat Ann 1969 Rev § 5.3057[1] *et seq.*), the Housing Cooperation Law, finds "there exist *in the state* unsafe and insanitary housing conditions and a shortage of safe and sanitary dwelling accommodations for persons of low income" and declares that to remedy these conditions "constitutes a public use and purpose and an essential governmental function." (Emphasis added.)

PA 1966, No 346 (MCLA § 125.1401 *et seq.;* Stat Ann 1968 Rev § 16.114[1] *et seq.*), the State Housing Development Authority Act of 1966, determines that

"there exists *in the state of Michigan* a seriously inadequate supply of safe and sanitary dwelling accommodations within the financial means of low income or moderate income families." (Emphasis added.)

PA 1941, No 250 (MCLA § 125.901 *et seq.;* Stat Ann 1969 Rev § 5.3058[1] *et seq.*), the Urban Redevelopment Corporations Law, finds that *"in the cities of the state* substandard and insanitary areas exist"* and provides for their redevelopment. (Emphasis added.)

PA 1969, No 304 (MCLA § 125.1501 *et seq.;* Stat Ann 1970 Cum Supp § 5.3518[1] *et seq.*), the Urban Redevelopment Financing Act, adopted after the purchase of the Florida property, determines "that it is essential to the public health, safety, and *welfare of the state and its residents to rectify blighted conditions in municipalities of the state."* (Emphasis added.)

General regulation of housing aside, the public policy of this state as to housing may be summed up as twofold: (1) to reduce or eliminate slums and blighted areas; (2) to provide housing for certain residents of the state, primarily persons of low or moderate income.

It would seem evident that the purchase of an 88-unit apartment building in Florida to meet the needs of the elderly of a Michigan city of 112,007 is completely beyond the public policy of this state. Even if it were not, the attempt to place the management and operation of such a building in the hands of the Housing Director of the City of Dearborn is an impermissible exercise of governmental power. (See footnote 1.)

The primary purpose of a city is to serve local needs. Constitutional and statutory provisions with regard to home rule are intended to allow cities to

meet such local needs. The housing project here in question cannot be a public work of a municipality of this state because it is outside the State of Michigan. As a proprietary venture, since it does not serve local needs, it does not meet the test of public use which a city must meet when it ventures into such an activity. It is not authorized by legislative enactment or by the public policy of this state. I would reverse the Court of Appeals and the trial court and would remand for further proceedings by the trial court for the sale and liquidation of this property by the City of Dearborn.

No costs, a public question being involved.

T. M. KAVANAGH, C. J., and T. G. KAVANAGH, J., concurred with ADAMS, J.